**In re STRATOSPHERE CORPORATION SECURITIES LITIGATION.**

This Document Relates to: All Actions.

No. CV–S–96–0708–PMP (RLH).

United States District Court, D. Nevada.

April 7, 1998.

1098

Kevin P. Roddy, Milberg Weiss Bershad Hynes & Lerach LLP, Los Angeles, CA, William S. Lerach, Spencer A. Burkholz, San Diego, CA, Jules Brody, Edward P. Dietrich, Stull, Stull & Brody, New York City, co-lead counsel, for plaintiffs.

G. Mark Albright, Albright, Stoddard, Warnick & Albright, Las Vegas, NV, Eleissa C. Lavelle, Lavelle–Stubberud & Associates, Las Vegas, NV, Liaison counsel, for plaintiffs.

Kirk B. Lenhard, Kim Boyer, Jones, Jones, Close & Brown, Las Vegas, NV, Martin C. Washton, Gareth T. Evans, James P. Maniscalco, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for defendants Grand Casinos, Inc., Lyle A. Berman, Stanley M. Taube, David R. Wirshing, Thomas A. Lettero, Andrew S. Blumen and Thomas G. Bell.

Dennis L. Kennedy, Laurel E. Davis, Lionel Sawyer & Collins, Las Vegas, NV, Martin Glenn, Scott A. Schrader, Alfred P. Levitt, O'Melveny & Myers, New York City, Seth Aronson, David R. Garcia, O'Melveny & Myers, Los Angeles, CA, for defendants BT Securities Corporation and Montgomery Securities.

Michael R. Mushkin, Mark C. Hafer, Mushkin & Hafer, Las Vegas, NV, Randy G. Gerchick, Hughes Hubbard & Reed, Los Angeles, CA, for defendants Bob Stupak and Bob Stupak Enterprises, Inc.

## ORDER

PRO, District Judge.

Presently before the Court are several motions relating to Plaintiffs' claim that Defendants violated provisions of the Securities Act of 1933, the Securities Act of 1934, and Nevada State Securities Laws regarding the sale of Stratosphere Corporation ("Stratosphere") securities.

On October 6, 1997, Defendants Grand Casinos, Inc. ("Grand Casinos"), Lyle A. Berman ("Berman"), Stanley M. Taube ("Taube"), David R. Wirshing ("Wirshing"), Thomas A. Lettero ("Lettero"), Andrew S. Blumen ("Blumen"), and Thomas G. Bell ("Bell") (collectively the "Defendants") filed a Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") (# 135). On September 30, 1997, Defendant Bob Stupak ("Stupak") and Bob Stupak Enterprises, Inc. ("BSE") filed a Notice of Joinder (# 130) with Grand Casinos' Motion to Dismiss. Plaintiffs filed Oppositions to Stupak's Motion (# 139) on November 4, 1997, and to Grand Casinos' Motion (# 145) on November 13, 1997. Grand Casinos filed a Reply (# 150) on November 25, 1997.

On September 30, 1997, Defendants BT Securities Corporation and Montgomery Securities (collectively "the Underwriters") filed a Motion to Dismiss the SAC (# 129). Plaintiffs filed an Opposition (# 141) on November 4, 1997, and the Underwriters filed a Reply Brief (# 146) on November 14, 1997.[1] Oral Argument on all the above motions was conducted on March 26, 1998.

### I. Procedural History

This Court previously dismissed Plaintiffs' First Amended and Consolidated Class Action Complaint with prejudice, for failure to meet Federal Rule of Civil Procedure Rule 9(b)'s requirement of pleading fraud with particularity. *In re Stratosphere Corp. Sec. Litig.*, Fed.Sec.L.Rep. (CCH) ¶ 99,473, 1997 WL 581032 (D.Nev.1997). Subsequently, this Court granted Plaintiffs' Motion to Alter

---

1. Plaintiffs also filed Supplemental Case authority with this Court after the Motions were fully briefed. (è151, 152, 155, and 160). Defendants filed Responses and Motions to Strike this Supplemental Authority. (è153, 154, 156, 157 and 158). This Court has read and considered the Supplemental Case Authority filed by Plaintiffs, and while it was beneficial to this Court's general understanding of the issues involved in this case, for the most part, it is not persuasive authority.

or Amend Judgment and for Leave to Amend, allowing Plaintiffs to file an amended Complaint in light of new evidence obtained through discovery in a related bankruptcy proceeding. (# 118). Bankruptcy Case No. BK–S–97–20554–GWZ.

## II. Factual Background[2]

This is a class action brought on behalf of all persons, other than Defendants, who purchased the common stock and/or call options of Stratosphere during the period from March 3, 1995, through July 22, 1996. Plaintiffs allege that the Defendants made false and misleading statements regarding the sale of Stratosphere securities, in violation of federal and Nevada state securities laws.[3]

The Stratosphere is a hotel, casino and retail center, including a 1,149 foot Tower ("the Tower"), in Las Vegas, Nevada. The initial public offering ("IPO") of Stratosphere stock occurred on February 23, 1994. Plaintiffs contend that Stratosphere's Prospectuses for two 1995 offerings, Form 10–K, Form 10–Q and various public statements by Stratosphere officials were false and misleading when made. They also allege that when the true circumstances regarding Stratosphere's financial condition were revealed in July of 1996, the price of Stratosphere stock plummeted, resulting in damages to the Plaintiffs. By end of class period, the stock had plunged from a high of $14 per share to just $3 per share. After the class period, it dropped to less than $1 per share prior to Stratosphere's January 27, 1997, Bankruptcy filing.

## III. Legal Standards

### A. Motion to Dismiss

In considering a Motion to Dismiss, the factual allegations of a complaint must be presumed to be true, and this Court must draw all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828

F.2d 556, 561 (9th Cir.1987). The issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence in support of their claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not, however, necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the complaint. *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). It is not the Court's role to weigh evidence which could possibly be presented at trial, the Court must merely determine if the Complaint itself if legally sufficient. *In re Health Management, Inc. Sec. Litig.*, 970 F.Supp. 192, 199 (E.D.N.Y.1997).

In ruling on a Motion to Dismiss, a court generally " 'may not consider any material beyond the pleadings.' " *Cooper v. Pickett*, 137 F.3d 616, 622 (9th Cir.1998) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994)). However, if the complaint specifically refers to a document and its authenticity is not questioned, a court may consider the full texts of documents which the complaint partially quotes. *See Id.* at 622.

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) states that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity. Fed. R.Civ.P. 9(b). Rule 9(b) applies to actions brought under the federal securities laws. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1545 (9th Cir.1994).

▮▮▮▮ Under Rule 9(b), a plaintiff must set forth an "explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed*, 42 F.3d at 1548. The most direct method of proving false or misleading statements is to cite inconsistent contemporaneous statements or internal in-

**2.** This Court will set forth in more detail the myriad of specific factual allegations contained in the 124 page SAC in its general discussion of the SAC's contentions, at part III of this Order, infra.

**3.** Plaintiffs allege violations of §§ 11, 12(2) and 15 of the Securities Act of 1933 ("Securities Act"); §§ 10(b), 20(a), and 20A of the Securities and Exchange Act of 1934 ("Exchange Act"); SEC Rule 10(b)–5; N.R.S. §§ 90.570, 90.660, and 207.350; and claims for Negligent and Intentional Misrepresentation.

formation available to defendants. *Id.* at 1549. A plaintiff may also use later statements by defendants, such as "I knew it was false all along." *Id.* at 1549 n. 9. Additionally, circumstantial evidence will satisfy Rule 9(b) if it explains how and why the statements were misleading when made. *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir.1995).

### 1. Application to Section 11 and 12(2) Claims

■ This Court rejects Plaintiffs' argument that Rule 9(b) does not apply to their §§ 11 and 12(2) Securities Act claims. The Ninth Circuit stated in *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997), that "the particularity requirements of Rule 9(b) apply to claims brought under Section 11 when, as here, they are grounded in fraud." *Id.* at 1404. In *In re Stac*, the court applied Rule 9(b) even though the complaint specifically disclaimed any reliance on fraud for the section 11 claim. *Id.* at n. 2. The court stated "These nominal efforts are unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus." *Id.*

Section 11 does allow recovery for negligent, non-fraudulent conduct. In the SAC, plaintiffs have alleged that the Defendants in some instances failed to use due diligence, or "should have known" statements were inaccurate. However, the overwhelming majority of allegations in the SAC concern the fraudulent concealment or misrepresentation of material information, claiming that the Defendants knew of Stratosphere's true financial condition, yet purposefully issued optimistic and false statements. Plaintiffs cannot avoid the more stringent requirements of Rule 9(b) by merely inserting boilerplate language into their Complaint stating that claims are based in negligence, not fraud.

Therefore, as the Complaint is grounded in fraud, Rule 9(b) applies to the entirety of the SAC.

### C. The Private Securities Reform Act of 1995

The Private Securities Reform Act of 1995 ("PSLRA") amended the Exchange Act and the Securities Act, and applies to private plaintiff class actions. The PSLRA involves both substantive and procedural law changes, including pleading requirements,[4] automatic discovery stays and "safe harbors" for forward looking statements. This Court will first examine the PSLRA provisions relevant to the present action, then determine if the SAC meets the requirements of Rule 9(b) and the PSLRA.

### 1. Retroactivity of the PSLRA

■ Plaintiffs initially argue that the PSLRA does not apply to their claims, as a few of the events giving rise to those claims occurred before the enactment of the PSLRA on December 22, 1995.[5] Plaintiffs argue that under the test set forth in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the PSLRA does not apply to conduct occurring before December 22, 1995. In *Landgraf,* the Supreme Court set forth a two part test. A court must first determine if Congress has expressly prescribed the statute's proper reach. *Id.* at 280. If so, then there is no need to resort to judicial default rules. If not, the court must determine whether the statute has a retroactive effect. *Id.* This entails a determination of "whether [the statute] would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*

Section 108 of the PSLRA states, "[t]he amendments made by this title shall not affect or apply to any private action arising under title I of the Securities and Exchange

---

**4.** There is no indication in case law or in the PSLRA itself that the PSLRA abolished the Rule 12(b)(6) standard governing Motions to Dismiss in cases involving the Securities or Exchange Act.

**5.** Claims under the Securities and Exchange Acts involve *both* false or misleading statements and

information, and the sale or purchase of a security. It is undisputable that the overwhelming majority of sales of Stratosphere securities occurred after the PSLRA's enactment date. Furthermore, as discussed infra, Plaintiffs' March 1995 claims are barred by the relevant statute of limitations.

Act of 1934 or title I of the Securities Act of 1933, commenced before and pending on the date of enactment of this Act." P.L. No. 104–67, 109 Stat. 737, 758 (1995). Most courts analyzing this section of the PSLRA have held that it applies to all actions filed after December 22, 1995, regardless of when the conduct giving rise to the claim occurred. *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F.Supp. 746, 754 (N.D.Cal.1997); *Hockey v. Medhekar*, Fed.Sec.L.Rep. (CCH) ¶ 99,465, 1997 WL 203704 (N.D.Cal.1997).

Despite these decisions from other jurisdictions, this Court cannot conclude that Congress clearly expressed its desire to retroactively apply the PSLRA in the language of section 108. There is a presumption against retroactive legislation deeply rooted in American Jurisprudence. *Landgraf*, 511 U.S. at 265. The question is not merely whether Congress has expressed when the statute is applicable, but whether Congress has evidenced a "clear intent" that a statute be applied retroactively. *Hughes Aircraft Corp. v. United States*, —— U.S. ——, 117 S.Ct. 1871, 1876, 138 L.Ed.2d 135 (1997). There is simply no clear expression of Congressional intent to apply the PSLRA retroactively in section 108.[6]

In *Landgraf*, the Court found that if Congress had intended to make the statute at issue retroactive, it would have used the following language: "the new provisions 'shall apply to *all proceedings pending on* or commenced after the date of enactment of the Act.'" *Landgraf*, 511 U.S. at 259–260 (emphasis added). The PSLRA provides that the PSLRA *shall not affect actions commenced before and pending* on the date of enactment. Therefore, while the language is not precise, the most likely Congressional intent which can be inferred from the language of the PSLRA is that it is not retroactive, as it expressly negates the retroactive language articulated by the Supreme Court in *Landgraf.*

As there is no clear expression of Congressional intent to apply the PSLRA retroac-

tively, this Court must move to the second step of the *Landgraf* analysis. Applying the test for retroactivity, this Court finds that the Plaintiffs did not posses a "right" to sue Defendants under certain pleading requirements or burdens of proof which was impaired by the PSLRA. The PSLRA also did not increase the Defendants' liability for past conduct. Thus, this Court must determine if the PSLRA imposed new duties with respect to the sale or purchase of Stratosphere stock prior to December 22, 1995.

This Court notes that a statute is not deemed retroactive under *Landgraf* merely because the statute is applicable to conduct preceding the statute's enactment or upsets expectations based in prior law. *United States Securities and Exchange Comm'n v. Fehn*, 97 F.3d 1276, 1286 (9th Cir.1996) (quoting *Landgraf*, 511 U.S. at 269). While there is a presumption against retroactive legislation, this presumption is grounded in the elementary consideration of fairness, that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. *Landgraf*, 511 U.S. at 265.

A finding that a statute operates retroactively comes after a court evaluates the nature and extent of the change in the law, and the degree of connection between the operation of the new rule and a relevant past event. *Landgraf*, 511 U.S. at 270. Given the facts before this Court, it is clear that the PSLRA does not operate retroactively in this case. The PSLRA contains many procedural changes, which do not raise concerns about retroactivity, since secondary conduct, not the primary conduct at issue, is affected. *Id.* at 275. The application of the substantive provisions of the PSLRA to the SAC does not implicate the fundamental notions of fairness at issue in *Landgraf.* The conduct at issue, if proved, would have been impermissible prior to the enactment of the PSLRA. Therefore, Defendants knew that material misstatements such as those alleged were impermissible, and they had an opportunity

---

**6.** The Ninth Circuit, in dicta, has stated, "[s]ection 108 of the PSLRA applies to private actions only from the date of enactment." *United States Securities and Exchange Commission v. Fehn*, 97

F.3d 1276, 1285 (9th Cir.1996). This does not reflect a finding of Congressional intent to apply the statute *retroactively.*

to conform their conduct accordingly. *See, Landgraf,* 511 U.S. at 265. It is only the burden of proof at trial which Plaintiffs must meet which has changed.

Additionally, the degree of connection between the operation of the PSLRA and the purchase or sale of Stratosphere securities is very weak. Virtually every purchase or sale of Stratosphere securities, and many of the alleged misstatements in this case occurred after December 22, 1995. Furthermore, individuals do not purchase securities primarily due to the technical provisions of the federal securities laws, they do so with an expectation of return on their investment. This Court finds it highly improbable that Plaintiffs would not have purchased their securities if they had known that the Second Circuit standard of proof would be applied to any potential litigation, or that certain statements would fall with in a "safe harbor" provision requiring defendants to know statements were false or misleading when made. This is especially so when virtually all of Plaintiffs' allegations are that the Defendants actually knew statements were misleading, and intended to defraud the Plaintiffs. Therefore, there is no real imposition of new duties with regard to the overwhelming majority of sales of Stratosphere stock at issue in the SAC.

Thus, upon the facts of this Case and the principles underlying the *Landgraf* decision, this Court finds that there is no impermissible retroactive effect to the PSLRA, and that it is applicable to Plaintiffs' claims.

### 2. PSLRA Pleading Requirements

The PSLRA mandates that if a plaintiff alleges that the defendant either made an untrue statement of a material fact, or omitted to state a material fact, rendering a statement misleading, the complaint "shall specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading . . . ." 15 U.S.C.

§ 78u–4(b)(1). If a defendant's state of mind is an element of the cause of action, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).[7] The PSLRA mandates dismissal, upon motion of the defendant, if the complaint fails to meet these requirements. 15 U.S.C. § 78u–4(b)(3)(A).[8]

The PSLRA also contains a "safe harbor" for forward looking statements. Generally, a defendant is not liable for forward looking statements if: (1) the forward looking statement is identified as a forward looking statement, and is accompanied by meaningful cautionary language; or (2) if the plaintiff fails to prove that the forward looking statement was made with actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 77z–2(c)(1)(B) (Securities Act); 15 U.S.C. § 78u–5(c)(1)(B) (Exchange Act).

Forward looking statements falling under the safe harbor provision are defined in the PSLRA. Generally, they consist of future predictions as to revenues, income, dividends, capital structure, or other financial items. This includes statements of future economic performance, and statements of the future plans and objectives of management for future operations. *See* 15 U.S.C. § 78u–5(i)(1).

### 3. Method of Proof

Courts interpreting the PSLRA's provisions have agreed to disagree. Some courts have held that only evidence of conscious behavior by a defendant meets the requirements of the PSLRA. *See, e.g., In re Silicon Graphics,* 970 F.Supp. 746 (N.D.Cal.1997). Other courts have adopted the Second Circuit test for pleading a strong inference of fraudulent intent. *See, e.g., Zeid v. Kimberley,* 930 F.Supp. 431, 438 (N.D.Cal.1996); *Marksman Partners, L.P. v. Chantal*

---

7. A plaintiff alleging a 10(b) or Rule 10(b)(5) allegation must prove scienter. *See In re Apple Computer Sec. Litig,* 886 F.2d 1109, 1113 (9th Cir.1989). Scienter is a "mental state embracing the intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

8. The PSLRA also provides for a mandatory stay of discovery during the pendency of any motion to dismiss. 15 U.S.C. 77z–1(b)(1). Plaintiffs in this case have received a very fortunate bounty, in that they obtained discovery through a related bankruptcy proceeding involving Stratosphere, which they otherwise would not have had.

*Pharm. Corp.,* 927 F.Supp. 1297, 1310 (C.D.Cal.1996); *In re Baesa Sec. Litig.,* 969 F.Supp. 238 (S.D.N.Y.1997). The Second Circuit test for pleading scienter in Rule 10(b) cases provides that a strong inference of fraud may be established by either (1) alleging facts showing defendants had both the motive and opportunity to defraud, or (2) alleging facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. *In re Health Management,* 970 F.Supp. at 200.

In interpreting the requirements of the PSLRA, this Court benefits from the many well researched and well analyzed decisions of various district courts. After carefully balancing the Congressional intent behind the PSLRA, the purpose of the federal securities laws, and the cases decided by other courts, this Court concludes that the Second Circuit standard is appropriate for analyzing claims brought under the PSLRA, with the exception that motive and opportunity, alone, does not presumptively prove the required state of mind under the PSLRA.

 The majority of Circuit Courts, prior to the PSLRA, held that recklessness was sufficient to state a claim under 10(b)(5). *In re Baesa,* 969 F.Supp. at 238, 241. The standard definition of recklessness in securities cases is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Baesa,* 969 F.Supp. at 241 (quoting *Chill v. General Elec. Co.,* 101 F.3d 263, 268 (2nd Cir.1996)). In reaching the conclusion that recklessness remains sufficient to prove scienter in the post-PSLRA world, this Court finds the Opinion in *In re Baesa* very persuasive and agrees that there is no indication in the statutory language of the PSLRA that recklessness no longer· suffices for the scienter requirement of 10(b) claims.

This Court rejects such cases as *In re Silicon Graphics,* which require a strong inference of knowing or intentional misconduct

for all claims under the federal securities laws. 970 F.Supp. at 757.[9] This Court does not believe that Congress would abolish the well established use of recklessness as permissible scienter under .the securities laws without expressly stating so in the language of the statute. *See Marksman Partners,* 927 F.Supp. at 1309, 1311. In fact, where Congress intended to establish knowing conduct as a prerequisite for liability, it did so explicitly within the PSLRA, such as providing a safe harbor for forward looking statements. 15 U.S.C. § 77z–2(c)(1)(B); 15 U.S.C. § 78u–5(c)(1)(B). These provisions, which require that the plaintiff must prove forward looking statements were made with actual knowledge of their falsity, would be entirely meaningless if actual knowledge were required for *all* allegedly misleading statements.

Therefore, recklessness is sufficient to prove scienter under the PSLRA, unless the statute, specifically provides otherwise, as in the safe harbor provisions. This Court concurs with the finding in *In re Baesa* that courts concluding otherwise are using the admittedly convoluted Legislative history of the PSLRA to read something into the PSLRA which is not contained in the text itself. 969 F.Supp. at 241.

 Since the PSLRA adopts the "strong inference" of the second prong of the Second Circuit test, it must be determined whether the first prong of that test, using motive and opportunity, remains permissible. This Court concurs with the court in *In re Baesa* that pleading motive and opportunity is no longer automatically sufficient. The court in *In re Baesa* found that motive and opportunity may be relevant to pleading circumstances creating a strong inference of fraudulent scienter, and that in some cases, it may be sufficiently strong standing alone. 969 F.Supp. at 241. However, motive and opportunity cannot be presumed to be sufficient, but must be part of the allegations a complaint sets forth raising a strong inference of the required scienter. *Id.* An elimination of the ability to rely solely on motive and oppor-

**9.** In *In re Silicon Graphics,* the Securities and Exchange Commission filed an amicus brief urging the court to reconsider its finding that know-

ing or intentional conduct was required for all claims. 970 F.Supp. at 754.

tunity to create a presumption of scienter strengthens the Second Circuit standard, in accordance with the Legislative intent to strengthen existing pleading requirements for Securities and Exchange Act claims.

### 4. Group Pleading

██ Defendants contend that the PSLRA abolished the group pleading doctrine. Under this doctrine, plaintiffs may rely on a presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other 'group-published information,'" are the collective work of those individuals with direct involvement in the everyday business of the company. *In re Silicon Graphics,* 970 F.Supp. at 759 (quoting *In re GlenFed Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995)). This presumption is rebuttable, and at trial or on motion for summary judgment, a defendant may offer evidence that he or she had no involvement in creating the document at issue. *Id.*

Defendants contend that because the PSLRA requires that a plaintiff allege that *the defendant* made an untrue statement and that *the defendant* acted with scienter, group pleading is now abolished. However, even in *In re Silicon Graphics,* which established the most stringent of pleading standards under the PSLRA, the Court did not question whether group pleading was still viable post-PSLRA. Defendants offer no case authority for their proposition that group pleading has been sub silentio abolished by the PSLRA, and this Court declines to adopt such a proposition.

Plaintiffs have alleged that each of the individual Defendants, due to their high-level positions with Stratosphere, were directly involved in the day-to-day operations of the company at its highest levels, were privy to confidential information, directly participated in Stratosphere's management, and were involved in drafting, reviewing and/or disseminating the false and misleading statements. (SAC ¶ 33). Therefore, Defendants are not entitled to a Motion to Dismiss on this basis.

## IV. The SAC

### A. The SAC's Expanded Class Period

██ Defendants argue that the SAC impermissibly extends the class period to include the March 1995 Notes Offering.[10] In Plaintiffs' First Amended Complaint, the class period ran from December 19, 1995, through July 22, 1996. In the SAC, the class period alleged is March 3, 1995, to July 22, 1996. Upon dismissing Plaintiffs' First Amended Complaint, this Court granted Plaintiffs request for time to file a complaint "consistent with the allegations raised in their Motion for Leave to Amend." *In re Stratosphere,* Fed.Sec.L.Rep. (CCH) ¶ 99,-473. An extension of the class period by nine months to include an entirely new offering is not consistent with the allegations raised in Plaintiffs' Motion for Leave to Amend.

The relevant section of the federal securities laws provides as follows: "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e). A court may decide as a matter of law when the plaintiff discovered the alleged wrongdoing "when uncontroverted evidence irrefutably demonstrates that plaintiff discovered or should have discovered the fraudulent conduct." *Lilley v. Charren,* 936 F.Supp. 708, 714 (N.D.Cal.1996).

In their First Amended Complaint, Plaintiffs alleged primarily that statements made in connection with the December 1995 Stock Offering were false or misleading when made because Stratosphere's July 1996 quarterly report revealed extensive cost overruns and construction delays. The gravamen of Plaintiffs' claim relating to the March 1995 Offering is that the financial projections contained in the Notes Prospectus lacked a reasonable basis. (SAC ¶ 3). Plaintiffs argue that these projections, even if they were not false in March of 1995, were false when Defendants repeated them at later dates within the class

---

**10.** Montgomery Securities and BT Securities Corporation were not the underwriters for the March 1995 Notes Offering.

period. Defendants contend that Plaintiffs were aware of the facts giving rise to their claim regarding the March 1995 Notes Prospectus at the time of filing their First Amended Complaint.

At Oral Argument, this Court asked Plaintiffs what new facts were discovered during the related Stratosphere bankruptcy proceeding which made them aware of fraud relating to the March 1995 Offering. Plaintiffs only "fact" was that they discovered through the deposition of Mr. Tom Ryan, a securities analyst, that he had based his analyst reports on the March Notes Offering.

Plaintiffs have not offered sufficient factual allegations to conclude that they did not discover or should not have discovered their claim relating to the March 1995 Prospectus at the time of filing their First Amended Complaint. Whether the projections originally contained in the March 1995 Prospectus were false or became false when Defendants repeated them throughout the class period are facts that Plaintiffs should have discovered at the time of filing their First Amended Complaint. Even if the Plaintiffs did not know Mr. Ryan relied on the March 1995 Prospectus, they should have been aware of the facts that indicated that the March Prospectus was a false statement. One allegation that a securities analyst relied on the March 1995 projections in his report, and that Plaintiffs discovered this reliance in the related bankruptcy proceeding does not open the door for claims otherwise barred by the statute of limitations. Therefore, Plaintiffs attempt to extend the class period beyond the scope of the First Amended Complaint is impermissible.

## B. Application of the PSLRA Pleading Standard to the Motion to Dismiss

■ Virtually all of the statements at issue in the SAC are forward looking statements. The PSLRA applies to all forward looking statements in the SAC. Although section 11 and 12(2) claims under the Securities Act normally do not require that Plaintiffs allege or prove scienter, the PSLRA added a "safe harbor" provision to the Securities Act, 15 U.S.C. § 77z–2. This "safe harbor" applies to all private actions arising under the Securities Act "based upon an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading," with certain exceptions not applicable to Plaintiffs' claims. 15 U.S.C. § 77z–2(c)(1). Thus, for forward looking statements forming the basis of Plaintiffs' section 11 and 12(2) claims, as well as their Exchange Act claims, Plaintiffs must plead facts creating a strong inference that the Defendants knew the statements were false or misleading when made. However, Plaintiffs are not required to prove their entire case at this point, the allegations are sufficient if the facts support the required inferences.

Plaintiffs contend that in Motion to Dismiss, Defendants are advancing what are in fact Summary Judgment arguments. To the extent that Defendants are asking this Court to accept their interpretation of the documents at issue, Plaintiffs are correct. The reports, memoranda, and letters Plaintiffs cite in support of their claims involve extensive financial information which must be evaluated in context of the facts and circumstances existing at the time the documents were created. Defendants ask this Court to examine the documents, weigh Defendants' interpretation of those documents equally with Plaintiffs' interpretation, and conclude that Defendants' interpretation prevails. Additionally, Defendants ask this Court to resolve questions involving the authenticity of documents and the dates that certain documents were created.

While it is true that this Court may take judicial notice of certain documents at issue, and that this Court is free to interpret documents of which it takes judicial notice, Defendants are asking this Court to go beyond mere interpretation. To accept Defendants' arguments regarding the meaning of the financial data in many of the documents at issue would require this Court to resolve disputed inferences in favor of the Defendants. This is impermissible in deciding a Motion to Dismiss.

In considering a Motion to Dismiss, the factual allegations of a Complaint *must* be presumed to be true, and this Court must draw all reasonable inferences in favor of the

plaintiff. *Usher*, 828 F.2d at 561 (emphasis added). Therefore, when Plaintiffs cite certain documents, this Court must accept Plaintiffs' interpretation as true, unless there is no factual basis for that interpretation.

While it may be that each individual document, analyzed in isolation, is insufficient to create a strong inference of the required scienter, this Court must look at the inferences created by the entirety of the documents cited in support of a particular statement. Collectively, these documents, in some instances, support the required inference of scienter. To conclude otherwise would be to ignore the standard governing Motions to Dismiss. This would be entirely unfair, as the PSLRA provides a stay of discovery when a defendant's Motion to Dismiss is filed. Thus, this Court would be addressing summary judgment arguments, which usually address the facts as revealed through discovery, when all discovery has been stayed. The fact that the Plaintiffs in this case have received some discovery through the related bankruptcy proceeding makes this case unusual, but it does not affect this underlying premise. Once discovery is complete, this Court can consider alternative interpretations in light of the factual context and circumstances revealed through the discovery process.

## C. False or Misleading Statements[11]

The primary misstatements alleged in the SAC are, or are encompassed in: 1) The December 19, 1995, sale of common stock and the related Registration Statement and Prospectus; 2) Securities Analysts' Reports issued throughout the Class Period; and 3) Documents filed with the Securities and Exchange Commission ("SEC") and Defendants' Public Statements.

### 1. December 19, 1995 Offering

Plaintiffs allege that several statements within the December 22, 1995 Offering were false or misleading when made. This Order addresses each in turn.

### a. Phase I and Phase II Funding[12]

Plaintiffs contend that the December 1995 Prospectus stated that Phase I was fully funded, that Phase II would be funded by the proceeds from the Stock Offering, and that those proceeds were intended only for the construction of Phase II. (SAC ¶ 6). Plaintiffs contend that due to cost overruns which were misleadingly not disclosed, Defendants knew in December of 1995 that proceeds from the December offering would be used to partially fund Phase I, and that as a result, Phase II would be under funded. The SAC alleges that at time of the Stock Offering, Phase I construction was already approximately $18–26 million over budget, and that Phase II's construction budget was never completed. (SAC ¶¶ 5–6).

 The alleged statements that Phase I "was funded" are past tense statements, but they must be analyzed within the context of the entire Prospectus. The Prospectus also states that "[t]he $358.9 million anticipated to be necessary to fund Phase I is expected to be derived" from equity contributions, the Note Offering, capital lease borrowings, and the exercise of warrants. (Prospectus at 18–19). As the Prospectus was issued in December of 1995 and explicitly stated that construction was expected to be complete in April of 1996, the assumptions underlying the "was funded" language were forward looking as well. *See, e.g.,* 15 U.S.C. § 78u–5(i)(1)(A),

---

**11.** This Order addresses Bob Stupak's and BSE's liability at part III–G, and the Underwriter's liability at part III–H, infra.

**12.** In the prior Order (# 93), this Court found that the Prospectus did not represent that Phase I construction was *completed* or *fully* funded. *In re Stratosphere*, Fed.Sec.L.Rep. (CCH) ¶ 99,473, 1997 WL 581032. However, this Court stated that, "It is important to note that this allegation warrants dismissal not because this Court determines it is properly pled and not misleading, but rather that this allegation is not pled with particularity." *Id.* Originally, Plaintiffs generally referred to cost overruns, and relied solely upon the language "Phase I was funded" and the fact that Phase I was not *fully* funded, to show the statements were false and misleading. In view of the circumstances and cautionary language of the Prospectus, this was not enough to satisfy Rule 9(b)'s particularity requirement. As this Court expressly withheld a determination as to whether the language was misleading, Plaintiffs are not currently precluded from offering other facts to show that the phrase "Phase I was funded" was false and misleading when made.

(D); *Hockey,* Fed.Sec.L.Rep. (CCH) ¶ 99,465 (statements that transition to new products 'was successful' and that company had 'successfully shifted' its product mix were present or future statements in light of other language in the document). Additionally, the statement that proceeds from the December Offering were intended for construction of Phase II is a "statement of the plans and objectives of management", or a projection of capital structure under the statutory definitions. Therefore, for these statements, facts showing a strong inference of actual knowledge are required.

To prove that the Defendants knew the statements were false and misleading when made, Plaintiffs point to a December 27, 1995, construction budget prepared by Taylor International Corp. ("Taylor"), the construction firm in charge of the project, which was allegedly provided to Grand Casinos and the Individual Defendants. Plaintiffs allege that this budget indicated that total cost of construction for Phase I and Phase II was approximately $464 million, $18 million in excess of the $446.8 million project cost represented in the Registration Statement and Prospectus for the Stock offering. (SAC ¶ 7(b)). Plaintiffs cite a December 22, 1995, memorandum from Lettero to Berman detailing the costs of certain enhancements for Phase I, represented in the Registration Statement and Prospectus to cost $25 million, which Plaintiffs contend had already cost $40.6 million. (SAC ¶ 7). Plaintiffs also point to a January 3, 1996, Taylor document showing a $17 million overage for Phase I construction.

To contradict Plaintiffs' allegations relating to Phase I and Phase II funding, Defendants first argue that there is no allegation that any particular Defendant ever saw the December 27, 1995, budget report, and that Plaintiffs are improperly claiming two documents were created on the same date. However, Taylor was contractually obligated to update Stratosphere regarding the construction budget. Thus, taking all facts in light favorable to the Plaintiff, this Court may infer that Defendants would be aware of any cost overruns. Furthermore, even if the disputed document was not created on the same date as the Taylor budget, Plaintiffs have alleged another Taylor document dated January 3, 1996, which shows a $17 million overage for Phase I construction.

Defendants also assert that the Prospectus merely offered reasonable "estimates" regarding the expected uses and sources of funds. (Prospectus at 6, 18–19; Form 10–K at 17–18 (Ex. U to Defendants' Mtn to Dismiss)[13]; Form 10–Z at 11–12 (Ex. E)). Plaintiffs dispute that the statements were "estimates" and offer several documents (SAC ¶¶ 62–63) in support of this contention. Defendants attack these documents as not contemporaneous with the statements at issue, since they are dated between the end of December 1995 and June 1996, after the December 19, 1995, Prospectus became effective.

Defendants are incorrect in drawing a bright line rule that any documents offered to allege statements were false or misleading *must* either proceed the statements or be precisely contemporaneous with them. Whether documents support an inference that Defendants knew statements were false or misleading is a question of degree. It is true that one document dated in July of 1996 may be insufficient to show that a statement in December 1995, seven months earlier, is false,[14] but many of the documents at issue in the SAC do not involve such a lengthy time lag. In fact, several of the documents are mere days or weeks after the statement at issue. The length of time between the statement and the document must be addressed in light of the particular statement at issue.

Defendants further Claim that as the Stratosphere construction project was constantly changing in scope and size, it is particularly impermissible to utilize later documents to show fraud at an earlier date. This is a factor that this Court considers in determining whether the documents referenced in the SAC create the required inference of scienter. However, to state that construction

---

**13.** All references to exhibits ("Ex") relate to exhibits to Defendants' Motion to Dismiss (# 135).

**14.** *See In re Stratosphere,* Fed.Sec.L.Rep.(CCH) ¶ 99,473, 1997 WL 581032.

projects are inherently risky, and therefore an exception, would exclude all types of risk laden ventures from the general rule that later facts may support an inference of scienter. While it may be more difficult to utilize later documents to prove prior fraud in constantly changing or risky ventures, this Court finds no basis to refuse to utilize later documents in light of allegations of specific, concrete, cost overruns. Plaintiffs do not allege general construction project risks were not disclosed, instead they contend Defendants knew of specific cost overruns when they publicly represented that no such overruns had occurred, or were silent as to their existence.

Additionally, where no catastrophic event occurs between the time of the statement and the revelation of the truth, a Plaintiff may point to later inconsistent statements or conditions. *Fecht,* 70 F.3d at 1082. The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made. *Id.* at 1082–83, nn. 5–6. This Court finds that similar evidence may create a strong inference that Defendants knew the statements were false when made. While this is a factor in determining whether subsequent statements are sufficient to create the strong inference required, the fact that there is no catastrophic event between the allegedly misleading statement and later inconsistent statement does not create a presumption that the Defendants actually knew the statements were false when made.

Defendants next assert that what Plaintiffs allege are cost overruns are merely "enhancements," additional expenditures contemplated in light of anticipated further funding. Viewing these additional expenditures in a light most favorable to Plaintiffs, this Court cannot at this stage of the proceedings accept Defendants characterization of uses of funds, particularly given the ethereal nature of any additional funding. If these items were additional expenditures deemed necessary for the successful completion of the Stratosphere project, Plaintiffs plead allegations sufficient to support a strong inference that by excluding these items, certain statements were false or misleading when made. Therefore, Defendants are not entitled to dismissal on this basis, regardless of whether the additional costs were overruns or enhancements.

Defendants final contention is that as Stratosphere had a $50 million completion guarantee from Grand Casinos, cost overruns would not necessitate diversion of funds to Phase I construction, since the cost overruns were less than the completion guarantee amount. (SAC ¶¶ 23(b), 125; Prospectus at 18–19). However, Plaintiffs have alleged that funds were diverted to fund Phase I before the Grand Casino guarantee was completed. Plaintiffs contend that according to Stratosphere's September 29, 1996, Form 10-Q Report, the $48.5 million loan guarantee from Grand Casinos did not take place until September 1996. Furthermore, even if the completion guarantee could cover all cost overruns, this would not immunize Defendants from liability for representing that there were no cost overruns when in fact they knew such overruns existed.

Looking to the allegations of the Plaintiffs with regard to Phase I and Phase II funding and cost overruns, this Court concludes that Plaintiffs have pleaded sufficient facts to create a strong inference the Defendants actually knew the statements were false when made. Therefore, they have sufficiently pled these allegedly misleading statements under the PSLRA and Defendants are not entitled to a Motion to Dismiss on this basis.

**b. Grand Casinos' Completion Guarantee**

Plaintiffs claim that the Prospectus represented a Grand Casinos completion guarantee as a contribution rather than a loan. (SAC ¶ 23(b)). The completion guarantee committed Grand Casinos to complete the Minimum Facilities to enable Stratosphere to begin Operating and to contribute up to $50 million to the Stratosphere project. (SAC ¶ 23(b)). This is an alleged present tense representation, and Plaintiffs must allege facts showing that Defendants were reckless in making this representation. Defendants argue that the language in the Prospectus clearly represents the Guarantee as a loan, and that the language is not misleading.

The Prospectus stated in several places that Grand Casinos had provided a completion guarantee "under which Grand committed, subject to certain qualifications, to Complete the Minimum Facilities (as defined in the First Mortgage Note Indenture) and to pay project costs owing prior to completion, up to a maximum obligation of $50.0 million." (Prospectus at 5, 19, 21). On page 36 of the Prospectus, the completion guarantee was extensively discussed, including the language, "Funds made available by Grand pursuant to the Completion Guarantee will constitute loans to the Company. Payments of interest or principal on such subordinated advances may be paid to Grand if such payments are permitted as a Restricted Payment under the First Mortgage Note Indenture." (Prospectus at 36). The Notes to the Consolidated Financial Statements also stated that funds made available by Grand Casinos pursuant to the Completion Guarantee were loans to the company and set forth the relevant conditions, including that the loans would bear interest at the same rate as the First Mortgage Notes. (Prospectus at F–14, F–21–22).

Based on the clear language of the Prospectus, this Court concludes as a matter of law that reasonable minds could not disagree that the Grand Casinos completion guarantee was not represented as a loan, and was not misleading. *See Fecht,* 70 F.3d at 1081. Every brief mention of the guarantee stated that it was subject to qualifications, and the fact that it was a loan subject to interest costs was set forth extensively in three separate areas of the Prospectus. Thus, Defendants are entitled to dismissal of this claim.

### c. Thrill Rides

▉ Plaintiffs contend that due to undisclosed construction cost overruns, when the December Registration Statement and Prospectus was declared effective Defendants knew or in the exercise of due diligence should have known that Phase II construction would be substantially delayed, and that certain amenities and thrill rides would not open in April 1996. (SAC ¶ 69). Plaintiffs' position is that Defendants became aware that the Space Shot, one of the thrill rides, would be rendered non-operational for significant periods due to wind conditions and that a reasonable due diligence investigation would have revealed that the thrill rides were not feasible. (SAC ¶ 77). Plaintiffs also argue that Defendants knew or were reckless in not knowing that there was a need to redesign the floor plan, the need to modify High Roller to achieve greater speeds and problems with the retail center. (SAC ¶ 68–77). These allegations are forward looking, as they relate to the "plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer[.]" 15 U.S.C. § 78u–5(i)(1)(B).

The SAC fails to point to any contemporaneous facts showing that at the time of the Prospectus, Defendants knew cost overruns would prevent Stratosphere from building the amenities or thrill rides. Defendants contend, and this Court agrees, that even if Stratosphere experienced cost overruns and technical difficulties, Plaintiffs have failed to show that these problems were so enormous that a strong inference can be found that Defendants *knew* certain thrill rides and amenities would be impossible to construct. Furthermore, the December 1995 Prospectus stated that the Aquarium would partially owned and financed by Grand Casinos, and the Gorilla Ride would be owned and financed by Grand Casinos. (Prospectus at 3). Thus, cost overruns by Stratosphere would not affect the financing of these amenities.

Plaintiffs do not plead specific facts other than cost overruns creating a strong inference that Defendants knew statements regarding thrill rides and amenities were false when made.[15] Instead, Plaintiffs merely allege that Defendants "became aware" that the High Roller could not be operated at high enough speeds (¶ 76), that Defendants "became aware" that wind conditions would render the Space Shot non-operation for significant periods (¶ 77), and that construction of the Gorilla Ride had been declared unfeasible (¶ 76). Plaintiffs also contend that state-

---

15. One reference to a November 1994 memo from the project architect stating that due to cost restraints Stratosphere would not be a first class resort is not a fact creating a strong inference of the required scienter. (SAC ¶ 71).

ments that the Casino and Entertainment Complex were designed to appeal to most segments of the Las Vegas market were false when made because the floor plan of the casino did not optimize gaming revenues. (¶ 72). These are nothing more than the bare allegations contained in the First Amended Complaint. Accordingly, Defendants' Motion to Dismiss this claim is granted.

### d. Marketing

█ The next alleged false or misleading statements made by Defendants in the December 1995 Prospectus relate to the efforts made to market Stratosphere. The Prospectus contained a detailed description of an aggressive marketing plan, including multimedia advertising, public relations, direct mailings and in-casino displays and brochures at Grand Casino properties. (¶¶ 78, 79). These statements regarding marketing plans are forward looking statements under 15 U.S.C. 78u-5(i)(1)(B).

Plaintiffs argue that Defendant Berman's statements in July 1996 that "we had a limited marketing campaign" and that Defendants subscribed to a "build it and they will come" theory give rise to a strong inference that in December of 1995 the company had no intention to implement the marketing plan described in the Prospectus. As discussed in this Court's prior Order, *In re Stratosphere*, Fed.Sec.L.Rep. (CCH) ¶ 99,473, this statement does not by itself give rise to a strong inference of knowing behavior on the part of the Defendants, due in part to the nearly seven month gap between the statements in the Prospectus and Berman's statement.

The Prospectus represented that Phase I enhancements included $5.4 million for an increased media budget and $13.8 million for Phase I pre-opening costs and expenses, which Plaintiffs contend included marketing costs. (¶ 79). Plaintiffs also contend that the Defendants knew the proceeds from the stock offering would not be sufficient to fund the necessary marketing campaign, and that they knew they had only $1.2 to $2.7 million to spend on marketing. (SAC ¶ 84(a)). Plaintiffs also argue that an April 1996 budget analysis shows that Stratosphere only budgeted $2.7 million for marketing, rather than the $6.8 million represented in the Registration Statement and Prospectus. (SAC ¶ 15; RJN Ex. N.).

Plaintiffs claim Defendants knew these statements about marketing plans were false, due to construction costs and the fact that the company's working capital had decreased from $17 million to $177,000 by December 22, 1995. (SAC ¶ 84(c)). As discussed supra regarding the Thrill Rides, Plaintiffs have not pleaded cost overruns so overwhelmingly high that it creates a strong inference that Defendants knew these projections were false when made. Plaintiffs also fail to allege that the working capital account was the account from which marketing expenses were funded, and thus there is no connection alleged between the reduction in that account and Defendants' marketing projections.

Defendants correctly argue that there are no specific allegations that Stratosphere failed to spend either $5.4 million or $24 million on marketing in fiscal year 1997, as was projected in the Prospectus. Furthermore, these annual budgets do not "match" Plaintiffs allegations regarding pre-opening expenses. Therefore, the fact that as of April 15, 1996, Stratosphere had spent only $1.2 to $2.7 on pre-opening marketing is not indicative of fraud. (SAC ¶ 84(a); Ex N). Plaintiffs allege no statements regarding pre-opening marketing expenditures, other than alleging that the pre-opening costs and expenses included pre-opening marketing. However, the Prospectus does not specify pre-opening marketing costs, and even if pre-opening marketing costs were part of the $13.8 million Phase I pre-opening expenses, there are no facts from which this Court, or a potential investor, could ascertain which portion of pre-opening costs were for marketing. Therefore, there are no facts giving rise to a strong inference that Defendants statements about marketing were false when made, and Defendants are entitled to dismissal of this claim.

### 2. Securities Analysts' Reports

█ Plaintiffs allege that Defendants are liable for statements by securities analysts. Under the relevant federal securities laws, there are two types of liability related to

analysts' statements. First, a Defendant may be directly liable for false statements made to analysts in connection with the sale of a security. *Cooper*, 137 F.3d at 623. Secondly, a Defendant may be liable for statements made by an analyst if the defendant, or a company or its officers or directors puts an express or implied imprimatur on the projections by endorsing or adopting them. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir.1996).

A defendant "adopts" an analysts' report or forecast when he or she "sufficiently entangled himself [or herself] with the analysts' forecasts." *Id.* (quoting *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1059 (N.D.Cal.1993)). A one way flow of information from insiders to the analysts and from the analysts to their customers is insufficient to impose liability based on the analysts' statements. *Id.* In order to sufficiently plead adoption of an analyst's statement, a plaintiff must: 1) identify specific analysts, forecasts and name the insider who adopted them; 2) point to specific interactions between the insider and the analyst which gave rise to entanglement; and 3) state when these interactions occurred. *Zeid*, 930 F.Supp. at 435.

In analyzing Defendants' direct liability for false or misleading statements made to securities analysts, Plaintiffs have not alleged time, place, and content regarding specific statements. Plaintiffs simply generally allege that securities analysts based their reports on the public statements made by the Defendants in prospectuses, press releases and SEC filings, and that Defendants made misleading statements to those analysts. Thus, in the SAC, Plaintiffs have merely alleged liability based on the same facts and statements as those made to the general public. There are no additional specific or unique statements made to securities analysts. Therefore, there is no additional liability on this basis.[16]

Defendants also contend that Plaintiffs have failed to adequately allege that the Defendants endorsed or adopted the securities analysts' statements. *See In re Syntex*, 95 F.3d at 934. They argue at most, the allegations are that the analysts' reports were based upon information received from Defendants, or based upon discussions with Defendant Lettero. Defendants also note that the SAC fails to specify the content of any of these statements and discussions, or when they occurred.

Plaintiffs allege that information contained in analysts' reports was "obtained from, or based upon, information provided by the Individual Defendants, particularly Defendant Lettero, who, according to the analysts' sworn deposition testimony, reviewed drafts of analysts' reports, provided comments on them and discussed such reports with the analysts prior to their issuance by the Underwriter Defendants." (SAC ¶ 87).

Many of the allegations regarding liability for securities analysts' statements fail to allege specific interactions between the insider and the analyst giving rise to the entanglement, or allege when these interactions occurred. (*See* SAC ¶¶ 91, 96, 107, 108, 109, 112, 115, 117, 112, 122, 124, 127, 132). Instead, Plaintiffs merely allege that the reports were based on discussions with Lettero, information received in phone conversations, or information received from Stratosphere officials. "Alleging that defendants provided the analysts with the information on which their reports were based is not sufficient." *Lilley*, 936 F.Supp. at 715. This merely alleges a one-way flow of information, which is insufficient to impose liability based on the analysts' reports. *See In re Syntex*, 95 F.3d at 934. Therefore dismissal of these claims is appropriate.

Plaintiffs also point to two facsimile cover sheets from an analyst to Lettero for the proposition that Lettero endorsed or approved the reports, (SAC ¶ 90, Ex. L), and

---

**16.** *Cooper* is not to the contrary. The Ninth Circuit in *Cooper* found that a defendant could be liable for false statements to analysts if the defendant intended that the analysts communicate these false statements to the public. 137 F.3d at 623. Here, neither the false statements at issue, nor the intent to have analysts communicate these false statements, have been adequately pleaded in the SAC.

allege that certain analysts testified in depositions that Lettero was sent drafts of letters and sent drafts of reports prior to issuance by the analysts. (¶¶ 90, 92, 95). Plaintiffs also contend that Stratosphere and the Individual Defendants distributed copies of analysts' reports and/or provided a list of analysts' coverage of Stratosphere in the packages that the company sent to potential investors. (SAC ¶ 88). These allegations are sufficient to meet the pleading requirements for liability, and this Court does not dismiss liability based on these claims.

### 3. SEC Documents and Press Releases

██ Plaintiffs contend that Stratosphere's March 15, 1996, Annual Report, filed with the SEC on Form 10–K, reiterated the misleading statements contained in the December 1995 Offering. Plaintiffs also argue that certain roadshow presentation materials represented that the offering proceeds would be used only to fund Phase I, and that these statements were known to be false or misleading when made. Plaintiffs further assert that press releases by the Defendants contained false or misleading information relating to cost overruns and construction delays. Specifically, Plaintiffs claim that on March 14, 1996, Defendant Wirshing stated in a Stratosphere press release that construction had been proceeding very well, and that Defendants set forth misleading revenue projections in a May 1996 *Business Week* article.

Plaintiffs support these claims by citing Stratosphere's revised budget analyses for January, March and April 1996, which allegedly show construction costs well in excess of the amounts represented in the public statements and press releases. Plaintiffs also point to internal memoranda to show that Defendants knew these statements were inaccurate. (SAC ¶ 104). Plaintiffs contend that an internal budget analysis dated March 15, 1996, showed a construction budget $20 million in excess of that represented in the Registration Statement of December 1995.

Additionally, Plaintiffs contend a June 11, 1996, memorandum from Tim Cope to Berman reflected Defendants' knowledge of a $20.3 million unfunded construction cost overrun as of January 31, 1996. (SAC ¶ 79).

Collectively, these budgets and memoranda are facts creating a strong inference that Defendants knew these statements were false or misleading when made.[17] As Plaintiffs have met their burden under the PSLRA, Defendants are not entitled dismissal of these claims.

### D. Motive and Opportunity

██ Plaintiffs utilize the motive and opportunity prong of the Second Circuit test as a method of proving that Defendants knew the above statements were false or misleading when made. Plaintiffs allege several motives on the part of Defendants: 1) to inflate the value of Stratosphere and Grand Casinos securities; 2) to improve Stratosphere's balance sheet; 3) to maintain Stratosphere's financing and attract investor capital; 4) to boost Grand Casinos' reputation as a major gaming player; 5) to protect their executive positions, enhance their benefits packages, increase the value of their personal stock holdings, and obtain larger bonuses under Stratosphere's compensation plans; and 6) to engage in insider trading. (SAC ¶¶ 161–62).

All of these motives, except for insider trading, are insufficient to allege scienter. *See, Marksman Partners,* 927 F.Supp. at 1312. These motives are possessed, to a certain degree, by every corporate officer, or every officer with an interest in a related company. *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47 (2nd Cir.1995). To find such bare allegations sufficient to create motive and opportunity would unfairly infer an intent to defraud based on the position an individual held with a company. This would greatly weaken the PSLRA's pleading requirements, and is not in accordance with the legislative intent behind the act. Thus, the only showing of motive and opportunity at issue is the alleged insider trading of some the Defendants.

---

**17.** As discussed supra, Plaintiffs cannot base their claims against Defendants on similar statements made by securities analysts without showing that the Defendants adopted those statements.

In order for insider trading to support an inference of scienter, it must be in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from inside information. *Alfus v. Pyramid Tech. Corp.*, 764 F.Supp. 598, 605 n. 1 (N.D.Cal.1991). Sales must be unusual or suspicious in amount or timing to support a strong inference of fraud. *In re Silicon Graphics*, 970 F.Supp. at 767.

Plaintiffs contend that Defendant Stupak and BSE sold over $10 million worth of Stratosphere securities during the Class Period. Stupak's sales represented approximately 17% of his total holdings of Stratosphere stock. (SAC ¶ 24(b)). Plaintiffs allege that Stupak had a motivation to inflate price of Stratosphere stock, because he had obligations to customers of his previously owned casino, Vegas World, and Stratosphere stock was sold to satisfy these outstanding obligations. (SAC ¶ 24(d)). Defendant Bell sold 11,000 shares of Stratosphere stock, but the sale of 1,000 of these shares occurred in August of 1995, and there is no basis to conclude that the remaining sale is suspicious in either its timing or amount. (SAC ¶ 31). The other sales of Stratosphere stock were by Blumen, and occurred in October of 1995, which does not constitute a suspicious timing of stock sale, and there is no basis to conclude the amount is dramatically out of line with prior trading practices. (SAC ¶ 163).

The remaining sales of stock were sales of Grand Casinos stock, after Taube and Berman had purchased Stratosphere stock. (SAC ¶¶ 26, 27). Berman's sale constituted 20% of his Grand Casinos stock. Since Grand Casinos owned nearly 50% of Stratosphere, Plaintiffs contend its stock price was artificially inflated. (SAC ¶ 26). However, there is no factual allegation supporting this contention. Furthermore, there is no alleged sale of the Stratosphere stock these Defendants purchased.

The sale of Grand Casinos stock, coupled with the purchase of Stratosphere stock, does not adequately plead motive and opportunity under the Second Circuit test. While Stupak's and BSE's sales of stock may provide motive and opportunity in terms of his individual liability, it would be grossly unfair to impute his alleged intent, based on large sales of Stratosphere stock, to the other Defendants.

As to the other Defendants, this Court finds as a matter of law that the Plaintiffs have failed to allege facts showing that the trades were unusual or suspicious, in terms of amount or the timing of the sales. Most of the sales were of Grand Casino stock, not Stratosphere stock, and there is no specific allegation as to prior trading practices, Plaintiffs merely allege that the sales were "contrary" to prior practices. Plaintiffs also fail to allege any basis for their allegation that the price of Grand Casinos stock was inflated. Finally, "[t]he fact that the other defendants did not sell their shares during the relevant class period undermines plaintiffs' claim...." *Acito*, 47 F.3d at 54. Therefore, with the exception of Defendant Stupak and BSE, Plaintiffs have failed to prove motive and opportunity under the Second Circuit test.

### E. Actionable Misrepresentations and Omissions

#### 1. Bespeaks Caution

Defendants assert that management's predictions about the budget and timetable for construction, and predictions regarding future profits and cash flow are not actionable because they bespeak caution. *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir.1994). A court may rule that the bespeaks caution doctrine applies, and bars an action, where statements contain enough cautionary language that no reasonable inference can be drawn that the statement was misleading. *In re Worlds of Wonder*, 35 F.3d at 1413. However, the mere inclusion of some cautionary language is not enough to determine as a matter of law that statements were not misleading. *Lilley*, 936 F.Supp. at 714. This Court cannot find as a matter of law that statements are inactionable due to the bespeaks caution doctrine unless the "adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ'...." *In re Syntex Corp.*, 95 F.3d at 926.

Defendants contend that the language in the Prospectus bespoke caution, as it stated that there could be no assurances that sufficient cash flow would exist to meet expenses. *See In re Stac*, 89 F.3d at 1406. The Prospectus does contain language warning of the risks inherent in this type of enterprise. (Prospectus at 9, 12–19 (notes); Ex. R.; Form 10–K at 17–18 (Ex. U); Form 10–Q at 11–12, (Ex. E)). However, in light of Plaintiffs' allegations of specific cost overruns and construction delays, this Court cannot conclude that general warnings that "no assurances" could be made or that construction enterprises are inherently risky bespeaks caution as a matter of law. If, as Plaintiffs allege, Defendants knew of existing, specific cost overruns and construction delays which would necessarily affect operating revenues once Stratosphere opened, they cannot insulate these statements with general language about the risks inherent in every construction enterprise. Therefore, this Court cannot rule as a matter of law that the bespeaks caution doctrine insulates Defendants' statements.

### 2. Puffery

■■■ Defendants also assert that many of the statements in the SAC are inactionable "soft" statements of general optimism regarding future events or mere "puffery." The SAC intersperses specific allegations of cost overruns, misrepresented budget amounts and allocations with statements such as: management's belief that Stratosphere's unique attractions would make it a "must see" resort (SAC ¶ 100); the statement regarding Stratosphere's opening, "Everything has gone very smoothly. We've had a steady stream of people going up to the tower this morning[.]" (SAC ¶ 113); and the statement "We think that over time, the Stratosphere will become the symbol of Las Vegas." (SAC ¶ 114). These statements are nothing more than inactionable puffery, no reasonable investor could conclude that these statements were reliable predictions about Stratosphere's expected performance. *See Haskell v. Time, Inc.*, 857 F.Supp. 1392, 1398 (E.D.Cal.1994).

Plaintiffs also claim that Phase II budgets were unreasonable, because in fact there was no Phase II budget in existence. (SAC ¶ 7(a)). In support they cite a January 9, 1996, memoranda from Lettero, stating that certain estimates have been used to determine the cost of Phase II. (Ex. G). The SAC contains several such statements, which upon closer analysis are likely to prove inadequate as a basis for Defendants' liability. However, this Court concludes that it is not appropriate to ferret out every such allegation in the 124 page SAC at this point in the proceedings. As the Ninth Circuit Court of Appeals stated in *Cooper*, 137 F.3d at 623, "Since we conclude that, if proved, many of the allegations of the state causes of action, we need not at this juncture in the case opine on some of the closer questions, such as whether the rosy forecasts were known to be false and are therefore actionable. These judgments should be made after discovery is complete." *Id.* at 623.

### 3. Grand Casinos' Statements

■■■ Defendants contend that Plaintiffs have failed to allege that Grand Casinos made any false or misleading statements, and that Grand Casinos cannot be held liable merely because it was a controlling shareholder that loaned money to Stratosphere. A business entity may be liable for false or misleading statements if the statements were "(I) made by or with the approval of an executive officer of that entity, and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." PSLRA §§ 27A(c)(1)(B)(ii)(I) & (II). Defendant Berman was the Chief Executive Officer and director of Stratosphere, and the Chief Executive Officer and Chairman of the Board of Directors of Grand Casinos. (SAC ¶ 25(a)). Taube was a director of Stratosphere and a Vice President and director of Grand Casinos. (SAC ¶ 27). Both signed the registration statement for the stock offering.

Additionally, Plaintiffs have alleged a close relationship between Grand Casinos and Stratosphere, where Grand Casinos controlled the day to day operations, financing and planning decisions for Stratosphere, and that Grand Casinos was a Control Person under section 20A of the Exchange Act. Plaintiffs contend that the Management

Agreement provided that Grand Casinos would supervise the design, development, construction and opening of Stratosphere. (SAC ¶ 23(c)). Plaintiffs allege that Grand Casino controlled Stratosphere's Board of Directors, and was directly involved in unexplained project costs, marketing, and other management decisions. (SAC ¶ 23(c)). Grand Casinos also guaranteed the completion of certain minimum facilities to render Stratosphere operable. (SAC ¶ 23(b)). This is much more than merely alleging status as a majority or controlling shareholder, and imposing liability on that basis alone. Therefore, based on this close connection and statements by Grand Casinos officials, Plaintiffs have adequately alleged actionable misstatements by Grand Casinos.

## F. Section 11 and 12(2) Claims

### 1. Section 11 Claim

Section 11 of the Securities Act imposes "liability on signers of a registration statement, and on underwriters, if the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1201 (1st Cir.1996) (quoting 15 U.S.C. § 77k). A section 11 cause of action is available only to individuals who purchased stock actually sold in the offering at issue. *Guenther v. Cooper Life Sciences, Inc.*, 759 F.Supp. 1437, 1439 (N.D.Cal.1990).

■ To plead proper standing under section 11, a plaintiff must show that they purchased shares either directly in the public offering at issue, or that the securities they purchased are traceable to that public offering. *Lilley*, 936 F.Supp. at 715. If plaintiffs merely prove after-market purchases, they lack standing to maintain a claim under both section 11 and section 12(2) of the Securities Act. *See Murphy v. Hollywood Entertainment Corp.*, Fed.Sec.L.Rep. (CCH) ¶ 99,241, 1996 WL 393662 (D.Or.1996).

■ Defendants argue that because the SAC fails to limit its allegations to Plaintiffs who purchased shares in the Offering at issue, Plaintiffs lack standing to bring their section 11 claim, and it must be dismissed. However, Defendants offer no authority for the proposition that a complaint may not encompass those who purchased directly in the offering, and have standing to bring a section 11 claim, and those who did not, and are limited claims under the Exchange Act of 1934. Defendants also rely heavily on *Gould v. Harris*, 929 F.Supp. 353 (C.D.Cal.1996), but *Gould* is distinguishable, because in that case the court found that the SAC failed to set forth any allegations that either the named plaintiff or any of the unnamed plaintiffs purchased securities directly in the public offering at issue. *Id.* at 359. Furthermore, this Court disagrees with the *Gould* court, which found that the dicta in *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), eliminated the well established rule of allowing Plaintiffs to pursue their claims if their purchases can be "traced" to the offering at issue.

The SAC asserts a section 11 claim on behalf of "members of the Class who purchased shares of stock in the Stock Offering, or whose shares can be traced to the Stock Offering." (SAC ¶ 140). *See Harris*, 929 F.Supp. 353, 359 (C.D.Cal.1996). Additionally, certain members of the class are alleged to have purchased stock directly through the Registration statement at issue. (See SAC ¶¶ 21(m), (w), (x)). Therefore, certain members of the Plaintiff class have standing to bring a section 11 claim and dismissal on this basis is inappropriate.

### 2. Section 12 Claims

■ Section 12(2) of the Securities Act imposes liability on individuals who offer or sell securities by means of a prospectus or oral communication containing material misrepresentations or omissions. *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 535 (9th Cir.1989). A section 12(2) claimant must also purchase shares directly in the offering pursuant to the prospectus alleged to be misleading. *See Gustafson*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1. A section 12(2) claim may only be brought against a person who "offers or sells" a security to the plaintiff. *Shaw*, 82 F.3d at 1214–15.

The Supreme Court has established that under section 12, a person is a statutory

seller, or sells securities, if he or she either passes title of the security to the purchaser, or solicits the sale of the security. *Pinter v. Dahl*, 486 U.S. 622, 646–648, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).[18] In *Printer*, the Court noted that "[t]ypically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he 'anticipat[es] a share of the profits,' or receives a brokerage commission." *Id.* at 654 (quoting *Lawler v. Gilliam*, 569 F.2d 1283, 1288 (4th Cir.1978)).

Defendants argue that the only sellers at issue in the SAC are the Underwriters, because the December 1995 offering was a firm commitment offering.[19] (Prospectus at 41–42). In support of this contention, Defendants cite *Shaw*, 82 F.3d at 1214–15, ("[the issuer] and its officers cannot be held liable as 'sellers' under Section 12(2) unless they actively 'solicited' the plaintiffs' purchase of securities to further their own financial motives, in the manner of a broker or vendor's agent.... That is to say, in the typical 'firm commitment underwriting,' the ultimate investor can recover only from the dealer who sold to him or her"); *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 647 (N.D.Cal.1980) (issuer and officers and directors are not liable under section 12(2) where there is a firm commitment underwriting).

■ Defendants simply overstate the rule articulated in *Pinter* and *Shaw*. A firm commitment offering does not mean that only the underwriters selling the security may be sued, and that those involved in preparing the registration statement cannot be liable. In a firm commitment offering, officers of the company issuing the registration statement may not be held liable as "sellers" under section 12(2) "unless they actively 'solicited' the Plaintiffs' purchase of securities to further their own financial motives ..." *Shaw*, 82 F.3d at 1215. Thus, the Defendants will be liable if Plaintiffs prove that Defendants solicited the purchase of the securities, as described in *Pinter*, even though those securities were "sold" by various underwriting firms.

Plaintiffs, arguing the opposite extreme, cite several cases for the proposition that Defendants qualify as sellers under section 12 merely by signing the registration statement. *See, e.g., Degulis v.. LXR Biotechnology, Inc.*, 1997 WL 20832 (S.D.N.Y.) (by alleging that the issuer Defendants signed registration statements for the securities, Plaintiffs presented the possibility that they could prove that the issuer Defendants "actively solicited" the sale of securities); *In re Keegan Management Co., Sec. Litig.*, Fed. Sec.L.Rep. (CCH) ¶ 96,275, 1991 WL 253003 (N.D.Cal.1991) (to an individual who studies corporate filings and news releases before purchasing through a dealer on an the market, the corporation, its officers and directors, and other promoters of the stock appear to be the true "sellers." Thus it is reasonable to infer that Congress intended Section 12(2) to apply to such persons).

This Court finds that the question of whether an individual is a seller under section 12 is a question of fact, not properly decided on a motion to dismiss. However, in analyzing the definition of a seller under section 12, this Court concludes that merely proving that Defendants signed the allegedly misleading registration statement or prospectus for a firm commitment offering is insufficient to prove that Defendants were sellers under section 12. *See In re Chambers Dev. Sec. Litig.*, 848 F.Supp. 602, 625 (W.D.Pa.1994) (citing *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 636 (3rd Cir. 1989)). Additionally, merely being a "substantial factor" in causing a sale of securities is not sufficient in itself to render a defendant liable. *Pinter*, 486 U.S. at 654. Nor is it enough to be the "seller's seller" or to be the "cause" of a plaintiff's purchase of a security. *Shaw*, 82 F.3d at 1215.

Refusing to hold Defendants liable solely on the basis that they signed the Registra-

---

18. In *Moore*, 885 F.2d 531, the Ninth Circuit held that although the Supreme Court in *Pinter* addressed section 12(1) of the Securities Act, *Pinter*'s reasoning applies equally to 12(1) and 12(2), and that *Pinter* provides the standard for liability under both sections. *Id.* at 536.

19. In a firm commitment offering, the underwriters purchase the shares from the issuer and then resell them to the public.

tion Statement and Prospectus comports with the Supreme Court's guidance in *Pinter*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658, that "[s]ection 11(a) [of the 1933 Act] explicitly enumerates the various categories of persons involved in the registration process who are subject to suit under that section, including many who are participants in the activities leading up to the sale. There are no similar provisions in § 12, and therefore we may conclude that Congress did not intend such persons to be defendants in § 12 actions." *Id.* at 650 n. 26.[20] Simple involvement in preparing a registration statement or prospectus, or participation in activities regarding the sale of securities is not enough by itself to establish the kind of relationship between plaintiff and defendant sufficient to establish statutory seller status. *Shaw*, 82 F.3d at 1216. *See also*, Thomas Lee Hazen, *Treatise on the Law of Securities Regulation*, 3rd Ed., Vol I § 7.2 p. 375 (1995) ("Even substantial involvement in the preparation of registration and offering materials will not create liability unless there is also active involvement in the negotiations leading to the sale in question").

 Plaintiffs do allege that in addition to signing the registration statement, Defendant Lettero was involved in issuing underwriter's reports, Defendants were involved in roadshow presentations, and that Defendants solicited the sale of the securities at issue. Thus, Defendants status as statutory sellers has been adequately pled, and Defendants' Motion to Dismiss on this basis is denied.

### G. Stupak's and BSE's Liability

 Defendant Stupak and BSE argue that liability against them under section 20A of the Exchange Act is improper for two reasons: 1) no predicate violation of the Exchange Act or SEC Regulation has been shown by the Plaintiffs; and 2) plaintiffs cannot plead section 10(b) and 20A violations in the alternative.

This Court concludes that Plaintiffs have properly pled a violation of the Exchange

Act, therefore Stupak and BSE are not entitled to dismissal of the 20A claim on this basis. As to Stupak and BSE's second contention, this Court finds no basis for dismissal based on Plaintiffs' allegation of both 10b and 20A violations. Section 20A of the Exchange Act requires a predicate violation of the Exchange Act or SEC regulation to bring a 20A claim. 15 U.S.C. § 78t–1(a). Section 20A also provides that "[n]othing in this section shall be construed to limit or condition the right of any person to bring an action to enforce a requirement of this chapter or the availability of any cause of action implied from a provision of this chapter." 15 U.S.C. 78t–1(d).

A finding that 10(b) or 10(b)–5 claims and 20A claims cannot be pled in the alternative directly contradicts the plain language of 15 U.S.C. § 78t–1. *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1131 (W.D.Mich.1996). Therefore, this Court declines to adopt the reasoning of the court in *T. Rowe Price New Horizons Fund. Inc. v. Preletz*, 749 F.Supp. 705, 709–10 (D.Md.1990) (finding that 10(b)–5 and 20A may not be alternatively pled). This Court instead concurs with the Court in *In re Storage Tech. Corp. Sec. Litig.*, 804 F.Supp. 1368, (D.Colo.1992), which found that section 10(b) and 20A claims may be pled in the alternative. *Id.* at 1374.

### H. The Underwriter's Liability

#### 1. Scienter

 Plaintiffs have failed to allege facts creating a strong inference that the Underwriters knew that the forward looking statements contained within the Prospectus, or the securities analysts' reports issued by the Underwriters, were false or misleading when made. While the documents Plaintiffs cite may be relevant to the Director Defendants and Grand Casinos' scienter, there is no factual basis to conclude that the Underwriters were aware of any these documents, or knew of the falsity or misleading nature of the statements at issue.

---

**20.** Those enumerated in section 11(a) as liable include "(1) every person who signed the registration statement; (2) every person who was a director of (or person performing a similar func-

tion) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted...." 15 U.S.C. § 77k(a)(1)–(5).

Plaintiffs merely allege that the Underwriters knew of the falsity or misleading nature of the statements, but not facts sufficient to infer why they knew. Plaintiffs' sole basis to infer the Underwriters, scienter is that they were co-lead Underwriters for the December 1995 stock offering, and that they had access to Stratosphere and its top executives. (SAC § 35(c)). In support, Plaintiffs cite the Ninth Circuit's decision in *Cooper,* which found that scienter could be averred generally. 137 F.3d at 628. However, the complaint in *Cooper* was filed prior to December 22, 1995, and the PSLRA was therefore inapplicable. In fact, in *Cooper,* the Ninth Circuit explicitly noted that under the PSLRA, particularized facts must be pled which give rise to a strong inference that the defendant acted with the required state of mind. *Id.* at n. 2. *Cooper,* as a pre-PSLRA case, is not applicable to the allegations contained in the SAC.

Plaintiffs allegations regarding the Underwriters' scienter are nothing more than vague generalizations that would be applicable to every underwriter of securities. To accept Plaintiffs' argument would be to read the particularity requirement out of the PSLRA for underwriter defendants, as virtually all underwriters of securities have the type of "close connection" with a corporate defendant that Plaintiffs generally allege. This is hardly the sort of particularized factual allegation contemplated by the PSLRA.

### 2. Motive and Opportunity

■ Plaintiffs attempt to utilize the motive and opportunity prong of the Second Circuit test as a method of proving that the Underwriters knew the above statements were false or misleading when made. Plaintiffs allege several motives on the part of the Underwriters: 1) to inflate the value of Stratosphere and Grand casinos securities; 2) to make a market in those securities; 3) to avoid being stuck with "worthless" stock though a firm commitment offering; and 4) to receive higher fees for sales of the securities.

As with Plaintiffs' other allegations regarding the Underwriters, all of the motives al-

leged are insufficient, as they are possessed by every securities analyst or underwriter firm. To find these bare allegations sufficient to create motive and opportunity would unfairly infer an intent to defraud based on mere status. This would greatly weaken the PSLRA's pleading requirements, and is not in accordance with the legislative intent behind the PSLRA.

As for the Underwriters' alleged opportunity, Plaintiffs merely again allege that as co-lead underwriters, the Underwriters had access to Stratosphere and its top executives, and that the Underwriters had a close relationship with the Directors. However, there are no specific facts alleged to support this contention. Plaintiffs merely cite a letter from Lyle Berman to a BT Securities Managing Director, in which Mr. Berman voiced his approval of the work done by BT Securities analyst Tom Ryan. (SAC ¶ 35(a)). This is woefully inadequate. Therefore, the Plaintiffs have not shown a motive and opportunity sufficient to adequately support the required inference of scienter.

### 3. Control Person Liability

■ Plaintiffs have not pled sufficient facts to allege that the Underwriter Defendants are liable under 15 U.S.C. § 77o as control persons. Plaintiffs merely argue that because the Underwriters had "constant access" to Stratosphere and its executives, and due to the Underwriters' "close association" with Stratosphere, the Underwriters were control persons under section 15 of the Securities Act. This is insufficient. Plaintiffs factual allegations only show a one way flow of information from insiders to the stock analysts and Underwriting firms. Plaintiffs have merely alleged that "but for" the Underwriters' participation, the Stock Offering could not have been accomplished. This type of proximate causation is not a sufficient basis for "control person" liability, which requires the exercise of actual power or influence over a company. *See Jett v. Sunderman,* 840 F.2d 1487, 1495 (9th Cir.1988).[21] There are no factual allegations showing such control. Therefore, the Underwriters are entitled to be dismissed as defendants in this case.

---

**21.** The SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a [violator], whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b–2 (1995).

## I. State Law Claims

### 1. Individual Defendant's Arguments

Defendants argue that since this Court has no jurisdiction over the federal claims, the state law claims should also be dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). However, as Plaintiffs have alleged certain violations of the Securities and Exchange Acts sufficiently, dismissal of the state law claims on this basis is improper.

### 2. Underwriters' Arguments

#### a. PSLRA

■ The Underwriters argue that Plaintiffs' claims for violations of Nevada's securities laws, N.R.S. sections 90.570 and 90.660, must be dismissed due to Plaintiffs' failure to prove a 10(b)–5 claim under the Exchange Act against the Underwriters. In support, the Underwriters cite *Shivers v. Amerco*, 670 F.2d 826 (9th Cir.1982), which found that Nevada's securities laws are interpreted consistently with Rule 10(b)–5. *Id.* at 831. While this Court agrees that it is proper to interpret Nevada's securities laws consistently with similar federal law provisions, this Court cannot conclude that this general rule warrants the impositions of the drastic changes enacted by the PSLRA to Nevada's securities laws.

One reason the Ninth Circuit found that Nevada's laws should be interpreted consistently with federal 10(b)–5 claims was that Nevada had chosen to enact laws paralleling Rule 10(b)–5. However, the PSLRA enacted great changes in federal securities laws, both procedurally and substantively. While states are certainly free to adopt similar changes in their own laws, comity weighs against imposition of such changes in the absence of action from state legislatures. Therefore, as the basis of this Court's finding that Plaintiffs fail to state a claim under the Exchange Act rests upon the provisions of the PSLRA, particularly the safe harbor provision, this Court does not apply these additional requirements to Plaintiffs' state law claims, and a Motion to Dismiss on this basis is improper.

#### b. Negligent and Intentional Misrepresentation

■ Plaintiffs also allege claims for negligent and intentional misrepresentation. The Underwriters contend that Plaintiffs do not properly allege actual reliance on the alleged misrepresentations made by the Underwriters. One of the requirements of a misrepresentation claim under Nevada law is that a plaintiff must show that he or she justifiably relied on the misrepresentation. To show such reliance, "[t]he false representation must have played a material and substantial part in leading the plaintiff to adopt his particular course; and when he was unaware of it at the time that he acted, or it is clear that he was not in any way influenced by it, and would have done the same thing without it for other reasons, his loss is not attributed to the defendant." *Nevada Power Co. v. Monsanto Co.*, 891 F.Supp. 1406, 1414 (D.Nev.1995) (quoting *Blanchard v. Blanchard*, 108 Nev. 908, 839 P.2d 1320, 1322 (1992)). Reliance "presumes that a plaintiff has actually read or heard those alleged misrepresentations in order to plead a cause of action for deceit." *Id.* (citing *Mirkin v. Wasserman*, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568 (1993) (rejecting the fraud-on-the-market theory for California state misrepresentation claims)).

To allege reliance, Plaintiffs contend that "[h]ad plaintiffs and the members of the Class known the true facts, they would not have purchased Stratosphere's securities at the prices they paid" (SAC ¶ 191), and "[i]n justifiable reliance upon said misrepresentations ... plaintiffs and the members of the Class were induced to and did purchase Stratosphere's securities at artificially inflated prices." (SAC § 188). However, Plaintiffs do not allege in the SAC that they actually read, or heard, or otherwise relied the misrepresentations at issue. Thus, they have not sufficiently pled intentional misrepresentation under Nevada law.

IT IS THEREFORE ORDERED THAT Defendant's BT Securities and Montgomery Securities Motion to Dismiss (# 129) is GRANTED and that Judgment is hereby entered in favor of Defendants BT Securities and Montgomery Securities and against Plaintiffs.

IT IS FURTHER ORDERED THAT Defendants Grand Casinos, Inc., Lyle A. Berman, Stanley M. Taube, David R. Wirshing, Thomas A. Lettero, Andrew S. Blumen and Thomas G. Bell's Motion to Dismiss (# 135), as joined by Defendants Bob Stupak and Bob Stupak Enterprises (# 130) is GRANTED as to the following claims: (1) The March 1995 Notes Prospectus; (2) The Grand Casinos' Completion Guarantee; (3) Thrill Rides and Amenities; (4) Marketing; (5) Certain Securities Analysts' Statements as set forth in this Order, and (6) state law claims for negligent and intentional misrepresentation.

IT IS FURTHER ORDERED THAT Defendant's Grand Casinos, Inc., Lyle A. Berman, Stanley M. Taube, David R. Wirshing, Thomas A. Lettero, Andrew S. Blumen and Thomas G. Bell's Motion to Dismiss (# 135), as joined by Defendants Bob Stupak and Bob Stupak Enterprises (# 130) is DENIED in all other respects.