### In re STRATOSPHERE CORPORATION SECURITIES LITIGATION.

**This Document Relates to: All Actions.**

**No. CV–S–96–708–PMP(RLH).**

United States District Court,
D. Nevada.

Oct. 4, 1999.

Kevin P. Roddy, Karen T. Rogers, Milberg Weiss Bershad Hynes & Lerach LLP, Los Angeles, CA, William S. Lerach, Spencer A. Burkholz, Michael L. Schrag, San Diego, CA, Jules Brody, Stull, Stull & Brody, New York City, for Co–Lead Counsel, plaintiff.

G. Mark Albright, Albright, Stoddard, Warnick & Albright, Las Vegas, NV, Eleissa C. Lavelle, Lavelle–Stubberud & Associates, Las Vegas, NV, for Liaison Counsel, plaintiff.

Kirk B. Lenhard, Jones Vargas, Las Vegas, NV, Martin C. Washton, Gareth T. Evans, James P. Maniscalco, Gibson, Dunn & Crutcher LLP, Los Angeles, CA, for defendants Grand Casinos, Inc., Lyle A. Berman, Stanley M. Taube, David R. Wirshing, Thomas A. Lettero, Andrew S. Blumen and Thomas G. Bell.

Dan R. Waite, Ike Lawrence Epstein, Beckley, Singleton, Jemison, Cobeaga & List, Las Vegas, NV, for defendants Bob Stupak and Bob Stupak Enterprises, Inc.

## ORDER

PRO, District Judge.

Presently before this Court is Defendants Grand Casinos, Inc.'s ("Grand Casino"), Lyle A Berman's ("Berman"), Stanley M. Taube's ("Taube"), David R. Wirshing's ("Wirshing"), Thomas A. Lettero's ("Lettero"), Andrew S. Blumen's ("Blumen"), and Thomas G. Bell's ("Bell") Motion for Summary Judgment or, in the Alternative, Summary Adjudication (# 182) filed on June 4, 1998. Defendants Robert E. Stupak ("Stupak") and Bob Stupak Enterprises ("Stupak Enterprises") filed two documents entitled Joinder in the Motion for Summary Judgment (# 189, # 194) on June 11, 1998 and June 23, 1998 respectively. Plaintiffs filed an Opposition (# 244) on April 2, 1999. Defendants filed a Reply (# 268) on June 16, 1999.

In conjunction with the Motion For Summary Judgment or, in the Alternative, Summary Adjudication (# 182), Defendants filed a Motion to Strike Expert Reports (# 259) filed on May 18, 1999. Plaintiffs filed an Opposition to Motion to Strike (# 263B) on June 9, 1999. Defendants filed a Reply in Support of Motion to Strike (# 270) on June 21, 1999.

Defendants also filed a Motion to Strike Plaintiffs' Separate Statement of Disputed Material Facts (# 263A) on June 9, 1999. Plaintiffs filed an Opposition to Defendants' Motion to Strike Plaintiffs' Separate Statement (# 271) on June 25, 1999.

# I. FACTS

## A. Procedural History

The proceedings in this case were consolidated before this Court on January 15, 1997. (Order # 29). The Court previously dismissed Plaintiffs' First Amended and Consolidated Class Action Complaint, with prejudice, for failure to satisfy the pleading requirements for fraud under Federal Rule of Civil Procedure 9(b). *See In re Stratosphere Corp. Sec. Litig.,* Fed.Sec. L.Rep. (CCH ¶ 99,473, 1997 WL 581032 (D.Nev.1997)). Thereafter, this Court granted Plaintiffs' Motion to Alter or Amend Judgment and for Leave to Amend, upon the discovery of new evidence obtained in a related bankruptcy proceeding. (Order (# 188)).

Plaintiffs filed a Second Amended Complaint (hereinafter "SAC") which alleged claims based upon: Sections 11, 12(2) and 15 of the Securities Act of 1933; Sections 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934; and Sections 90.570, 90.660 and 207.350 of the Nevada Revised Statutes. Upon considering Defendants' Motion to Dismiss, this Court dismissed all claims against the Underwriter Defendants and certain claims against the other Defendants. *See In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096 (D.Nev.1998). Defendants have now brought a Motion for Summary Judgment or, in the Alternative, Summary Adjudication in order to dismiss the remaining claims.

## B. Factual Background

This case is a class action suit brought on behalf of all persons, other than Defendants, who purchased common stock and/or call options of Stratosphere Corporation stock during the period between and including March 3, 1995 and July 22, 1996 (the "Class Period"). The Stratosphere Corporation ("Stratosphere") owns and operates the Stratosphere Tower, Hotel and Casino (the "Stratosphere Tower") located in Las Vegas, Nevada.

The prequel to the events disputed in this motion begin in the early efforts to raise funds for the construction of the Stratosphere Tower. The initial public offering of Stratosphere stock, which raised $51.4 million, occurred on February 23, 1994. On March 3, 1995, Stratosphere also completed a public offering of Mortgage Notes (the "Notes Offering") which raised roughly $203 million. To add to these funds, Grand Casinos also agreed to invest an additional $33.5 million. These funds, totaling $333.4 million, set the initial seed or estimated budget money for the construction of the Stratosphere Tower.

The construction project was ambitious. Its central feature was a 1,149–foot Tower that, upon its completion, would have the distinction as being the tallest freestanding observation tower in the United States. Construction work was divided into two stages, entitled Phase I and Phase II. Phase I was slated to include the erection of the Tower, a hotel, a 97,000 square-foot casino, and considerable numbers of slot machines and gaming tables. Phase II featured various enhancements upon the original design, including a new 1,000–room hotel, expanded and reconfigured retail and casino areas, a remodeled 1,000–seat showroom, a new parking lot, and other amenities. Construction began on May 1995. The target date for completion of Phase I was April 1996. Taylor International Corporation ("Taylor") served as Defendants' construction manager.

It is here that the events lying at the center of this motion take place. In order to acquire additional funds needed to complete the Stratosphere Tower construction project, Stratosphere completed a public offering of common stock on December 19, 1995. In conjunction with this offering, a Prospectus was issued that made various statements about the Stratosphere Tower construction budget and Stratosphere's general operating goals. The Prospectus also stated that an additional loan of $50 million (hereinafter the "Completion Guar-

antee") might be sought from Grand Casinos, in the event that such funding might prove necessary in order to complete Phase I. Other statements about construction progress and budgetary status were made by Stratosphere in: the March 11, 1996 Annual Report on Form 10–K; the May 15, 1996 Quarterly Report on Form 10–Q; and various press releases. Plaintiffs contend that Defendants knew that these statements were false and misleading when made, due to Defendants' intentional submission of last-minute changes to construction crews, thereby purposely raising project costs. Plaintiffs allege that when the actual circumstances regarding Stratosphere's financial condition were revealed in July of 1996, the price of Stratosphere stock plummeted from its artificially-inflated level, resulting in actionable losses to Plaintiffs.

Defendants vigorously deny these allegations of securities fraud. In their defense, Defendants contend that, through no fault of their own, construction costs and the state of the Stratosphere venture were extremely confused during the Class Period. Defendants assert that their access to information was limited solely to information provided by their construction manager, Taylor, and the internal budget analyses prepared by Stratosphere's management on the basis of such data. The reliability of these internal analyses, Defendants contend, was rough and somewhat speculative in nature. Defendants also claim that from January of 1996, construction activity increased to an almost feverish pitch in order to meet the April 1996 opening date. During the final 90 days of construction, Defendants contend that it suffered through a virtual "information blackout" of budgetary information.

By the end of the Class Period on July 22, 1996, the stock had dropped from a high of $14 per share to just $3 per share.[1] Predictably, litigation soon ensued. On April 8, 1998, this Court entered an Order

---

1. After the class period, Stratosphere stock value dropped to less than $1 per share im- mediately before Stratosphere's bankruptcy filing on January 27, 1997.

granting in part and denying in part the Motion to Dismiss filed by Defendants. What remains of the action are Plaintiffs' claims of (1) false and misleading statements and omissions made in relation to the sources and uses of funds for the construction of the Stratosphere project and (2) general statements of optimism regarding the performance of the Stratosphere Tower. Defendants now seek summary judgment dismissing these claims. In conjunction with this motion, Defendants have also filed motions to strike Plaintiffs' expert reports and separate statement of facts.

## II. LEGAL STANDARDS

### A. Motions to Strike or Exclude Expert Reports and Statements of Facts

In connection with their Motion for Summary Judgment, Defendants have moved to strike Plaintiffs' Separate Statement of Disputed Facts (# 245) and Plaintiffs' Expert Reports (# 246–248). Defendants' Motions to Strike are interrelated, as Defendants mainly seek to strike portions of Plaintiffs' Separate Statement on the grounds that the Statement "relies heavily upon the written opinions of plaintiffs' designated 'experts,' whose written opinions are without foundation ... [and] conclusory." (Defs.' Mot. to Strike # 263(a) at 1). The Court will consider Defendants' requests as the disputed materials arise during consideration of the Defendants' Motion for Summary Judgment.

■ Federal Rule of Evidence 702 provides that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Generally, a district court should not grant summary judgment where an expert's testimony supports the nonmoving party's case. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir.1997) (quotation and citation omitted). However, a district court must ensure that an expert's testimony "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Desrosiers v. Flight Int'l of Florida Inc.*, 156 F.3d 952, 961 (9th Cir.1998). To this end, the witness must be qualified to give the proffered testimony. *See Rogers v. Raymark Indus.*, 922 F.2d 1426, 1429 (9th Cir.1991).

■ In addition, the expert opinion must be supported by an adequate basis in relevant facts or data. *See* Michael H. Graham, 2 *Handbook of Federal Evidence* § 702.1, p. 29 (4th ed.1996); *see also General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."); *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (upholding district court's exclusion of conclusions in expert report with only "scant basis" in the record). The Supreme Court has recently clarified the ambit of *Daubert* and stated that this screening obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) (citation omitted). A district court should be especially cautious when experts comment upon the materiality or fraudulence of disputed misstatements in securities fraud actions. It is does not take any special competence, for example, to read pertinent public documents (e.g., prospectuses, press releases, and recorded statements) to determine whether certain risks were conveyed to the public. *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989).

**B. Summary Judgment Standard**

A motion for summary judgment is a procedure which terminates, without a trial, actions in which "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A summary judgement motion may be made in reliance on the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Id.*

The United States Supreme Court delineated the scope of Rule 56 in a trilogy of opinions rendered in 1986. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant is entitled to summary judgment if the non-moving party, who bears the burden of persuasion, fails to designate " 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). In order to preclude a grant of summary judgment, the non-moving party must do more than show that there is some "metaphysical doubt" as to the material facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the non-moving party must set forth " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The substantive law defines which facts are material. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. The Court will view the underlying facts in the light most favorable to the non-movant party. *See Martinez v. City of Los Angeles,* 141 F.3d 1373, 1378 (9th Cir.1998) (citing *Matsushita Elec. Indus. Co.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**C. Securities Fraud Liability and the Private Securities Reform Act**

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 743 (codified at 15 U.S.C.A. § 78u–4(b) (West 1999)), provides for both substantive and procedural changes in suits brought under the federal securities laws. These changes include the imposition of new pleading requirements, automatic discovery stays and "safe harbor" protections for certain kinds of statements. It is this latter provision that pertains to matters raised in this Motion.

The PSLRA accords "safe harbor" protection to oral or written "forward-looking" statements against claims of securities fraud. Forward-looking statements include, among other things:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission....

15 U.S.C.A. § 78u–5(i)(1)(A)–(C). Forward looking statements that, in hindsight, prove to be incorrect are not actionable where the plaintiff fails to prove that they were made with "actual knowledge" of their false and misleading nature at the time of their issuance. *See* 15 U.S.C.A. § 77z–2(c)(1)(B)(i) (West 1999); 15 U.S.C.A. § 78u–5(c)(1)(B)(i) (West 1999); *see also Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1309 n. 9 (C.D.Cal.1996). The actual knowledge requirement applies both to Plaintiffs' claims under Section 10(b) of the 1934 Act and claims under Sections 11 and 12(2) of the 1933 Act. *See* 15 U.S.C.A. § 78u–5(c)(1); 15 U.S.C.A.

§ 77z–2(c)(1); *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 199–200 (E.D.N.Y.1997).

### D. Means of Proof

 "Questions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment." *Braxton–Secret v. A.H. Robins Co.,* 769 F.2d 528, 531 (9th Cir.1985). Nevertheless, in appropriate cases, a court may grant summary judgment in favor of defendants in securities fraud suits on the issue of scienter. *See Shawmut Bank, N.A. v. Kress Assocs.,* 33 F.3d 1477, 1485 (9th Cir.1994). Therefore, "[a] plaintiff ... must offer more than conclusory allegations, and if the defendant presents affidavits or other evidence establishing a lack of scienter, the plaintiff must come forward with some affirmative showing." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1436 (9th Cir.1984), *quoted with approval in Kaplan v. Rose,* 49 F.3d 1363, 1379 (9th Cir.1994). Evidence indicative of a pattern of overall conduct inconsistent with scienter will dispel remote inferences of wrongdoing. *See In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1118 (9th Cir.1989).

 Contrary to the Defendants' arguments, however, this Court, when considering the issue of scienter, is not limited solely to evidence that is contemporaneous with the utterance of the disputed statements. Generally, it is true that "[t]he fact that the [defendant corporation's] prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re VeriFone Securities Litigation,* 11 F.3d 865, 871 (9th Cir.1993); *see also In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 930 (9th Cir.1996) (holding contrary internal memoranda written months after allegedly fraudulent statement could not establish commission of securities fraud); *In re Keegan Management Co., Securities Litigation,* 794 F.Supp. 939, 942 (N.D.Cal.1992) ("No [securities] law requires the prospectus to contain immaterial information or information that did not exist prior to its effective date."). Thus, the commission of securities fraud can be demonstrated "most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *In re GlenFed, Inc. Sec. Litig.,* 42 F.3d 1541, 1549 (9th Cir.1994) (considering permissible inferences in context of motion to dismiss).

But, "[t]his is not to say that a plaintiff might not find other ways to explain why a statement was false when made. A later statement by the defendant along the lines of 'I knew it all along' might suffice." *Id.* at 1549 n. 9 (citing *Greenstone v. Cambex Corp.,* 975 F.2d 22, 26–27 (1st Cir.1992)). This approach seems especially appropriate when, as in the case here, the alleged cause of the events leading to the stock's decline was not a catastrophic, external event (such as a rise in the price of needed commodities or an economic depression), but the apparent product of internal management decisions.

## III. DISCUSSION

Plaintiffs have alleged violations of both federal and state securities law through the alleged omission or fraudulent misstatement of material facts. Specifically, Plaintiffs contend that Defendants improperly: (1) omitted the existence of cost overruns in their December 19, 1995 stock offering Prospectus; (2) misstated budgetary requirements in SEC 10–K and 10–Q reports filed in 1996; (3) concealed the alleged diversion of funds in its statements within these SEC filings; (4) adopted the misleading statements of their analysts; (5) made overly optimistic non-budgetary statements about the status and prospects of the Stratosphere project; (6) made false or misleading statements to the Nevada Gaming Control Board; and (7) stated falsehoods within their June 6, 1996 Press Release. Defendants seek summary adjudication dismissing these allegations under (A) the PSLRA's "safe harbor" provisions;

(B) the materiality requirement; and (C) general standards of actionability under the Federal Rules of Civil Procedure and securities law.

## A. Safe Harbor Provisions of the PSLRA

### 1. Liability for Alleged Misstatements Within the December 19, 1995 Prospectus

In their SAC, Plaintiffs assert that material misstatements were made within the Stock Offering Prospectus, issued on December 19, 1995 (Prospectus, Ex. Q of RJN (# 134)), with actual knowledge of their falsity. This Court will now consider in turn Defendants' request for summary adjudication dismissing these allegations.

#### a. Phase I Funding and Use of Stock Offering Proceeds

First, Plaintiffs allege that the Prospectus falsely claimed that Phase I construction, projected to cost $358.9 million, "was funded" and that proceeds from the December stock offering "[would] be used, in connection with $8.7 million in proceeds remaining from the exercise of the Warrants, to construct Phase II of Stratosphere". (SAC ¶ 6) (referring to Prospectus at 5, 6, 14). Plaintiffs contend that due to cost overruns which were improperly and secretly hidden from the public, Defendants in fact knew as of December 1995 that Phase I was not fully funded and that proceeds from the December stock offering would have to be used to make up the difference. (SAC ¶ 7(a)–(c)).

■■■■ As this Court held in its previous ruling in *In re Stratosphere Corp. Securities Litigation*, 1 F.Supp.2d 1096, 1110–11 (D.Nev.1998), these statements were both predictive and forward looking under the terms of the PSLRA. While the clause stating that Phase I "was funded"

utilizes the past tense, its appearance in a Prospectus that repeatedly delineated the ongoing nature of construction to meet an April 1996 completion date (Prospectus at 3,9,19,20) clearly trumpeted its predictive nature. As the Prospectus was issued in December 1995, the assumptions underlying the "was funded" assertion were forward-looking. Similarly, the clause indicating that proceeds from the December Offering were intended for Phase II falls squarely within the statutory definitions of the PSLRA safe harbor provisions. *See* 15 U.S.C.A. § 78u–5(i)(1)(A)–(B)(according protection to statements describing capital structure, capital expenditure projections and management objectives).[2]

■■■■ Liability under the federal securities laws, then, cannot emerge unless Plaintiffs can demonstrate Defendants' actual knowledge of the falsity of their Phase I budgetary projections. To reach safe harbor, Defendants submit substantial evidence of their belief that, at the time of the issuance of the December 15, 1995 Prospectus, extant financial resources would fully fund Phase I construction. Contemporaneous internal documents and declarations from Stratosphere's corporate officers reveal an anticipated completion cost of Phase I construction equal to or several million dollars *under* the $359 million budget projected in the Prospectus. (Lettero Decl. ¶ 10; Blumen Decl. ¶ 4; Berman Decl. ¶ 5.) Cost updates produced by Stratosphere prior to December 1995 were entirely consistent with the aggregate costs and predicted expenditures delineated in the Prospectus. (Bell Decl. ¶ 2; Taube Decl. ¶ 2.) Beginning in May 1995, these internal cost updates incorporated the budget information submitted periodically by Taylor, the construction manager of Phase I. (Lettero Decl. ¶ 9; March 30,

---

**2.** The Court will strike from the record those portions of Professor Ted J. Fiflis' report, proffered by Plaintiffs, which auger to the contrary. The province of expert opinions lies within the analysis of factual issues, not legal ones. *See, e.g., Crow Tribe of Indians v.*

*Racicot,* 87 F.3d 1039, 1045 (9th Cir.1996) ("Expert testimony is not proper for issues of law."); *McHugh v. United Serv. Automobile Ass'n,* 164 F.3d 451, 454 (9th Cir.1999) (holding that expert testimony could not provide legal meaning of disputed policy provisions).

1995–June 1995 Budget Analysis, attached as Ex. A of Lettero Decl.)

In opposition, however, Plaintiffs submit sufficient evidence to raise triable issues as to the existence of actual knowledge of falsity. ·First, Plaintiffs cite a June 11, 1996, memorandum promulgated by Tim Cope, Chief Financial Officer of Grand Casinos. (Cope Memo, Ex. 116 of Appendix of Dep.Exs. (# 255)). In this memorandum, Cope notes that: "As of 10/3/95, *approved* project enhancements were reported to be [$41,236,000] of which [$34,600,000] was planned to be funded by the warrant exercise, leaving an unfunded balance of [$6,638,000]." (*Id.* at 2) (emphasis added). The Prospectus, though, provided for only $25.5 million in Phase I enhancement costs. (Prospectus at 6.) Viewing this statement in the light most favorable to Plaintiffs, one can infer that Defendants had clear knowledge of cost overruns prior to the December 1995 issuance of the Prospectus which would only be exacerbated by any further pattern of last-minute changes. (Opp. at 70–71.) While it is true that this document was created roughly six months after the issuance of the Prospectus, its contents constitute the type of "I knew it all along" information specifically approved of by the *GlenFed* court.[3] Secondly, Plaintiffs submit evidence that Defendants, through the issuance of an excessive number of last-minute design changes and new work orders in late 1995, intentionally transformed Stratosphere construction from a budget-limited endeavor into one that was "entirely schedule-driven" and wholly without regard for costs. (Opp. at 29.) It is undisputed by the parties that construction crews were forced to work vigorously in order to meet the April 1996 opening date. (Mason Dep. 11/5/98 at 85–89; Mason Dep. 11/6/98 at 41–43) (attached as Exs. 20–21, Appendix (# 251)). Plaintiffs proffer a memorandum from Taylor, issued in mid-December 1995, to support their allegations of acute management problems and additional labor demands caused by such last-minute construction changes. This memorandum states, in pertinent part:

> Since November 29, 1995, we have received approximately 285 sheets of revised drawings from Paul Steelman and/or other consultants. These drawings were issued directly to Taylor and, in turn to the contractors with instructions to proceed in the field with the work as per the revised or changed drawings. If the April opening date is to be maintained, we must immediately put a stop to all changes.

(Letter from Stuart. J. Mason, Taylor Int'l, to Andy Blumen, Stratosphere Corp.) (December 12, 1995) (attached as Ex. 19, Elliott Report). In a similar vein, Plaintiffs submit a letter from Stratosphere officer Scott Dawes requesting the assignment of additional men on certain construction crews. (Letter from Scott Dawes, Director of Construction, Stratosphere Corp., to Taylor Int'l (September 27, 1995) (attached as Ex. 34, Appendix (# 253))). It is true that these documents on their face seem to address only issues of scheduling and would not alone raise any triable issues. Nevertheless, in conjunction with the June 11, 1996, Lettero Memorandum, they raise the inference that Defendants were aware of significant new demands for labor, manpower, and

---

**3.** Defendants' attacks on the credibility of this evidence cannot obviate the need for issue determination at trial. It is true that Mr. Cope, in later deposition testimony, attempted to retract his use of the term "approved" enhancements and replace it with the term "planned" enhancements. (1/14/99 Cope Dep. at 585, attached as Ex. 8, Appendix (# 249)). Defendants also contend that the memorandum's use of the word "project" enhancements indicates that its estimates referred not only to Phase I costs, but the costs of Stratosphere construction as a whole (viz., both Phases I and II). (Defs.' R. at 33–35). Yet it is equally plausible, based upon the date of the estimate, to infer that the $41.236 million figure referred solely to Phase I costs. Where reasonable minds can draw competing inferences from the same facts, summary judgment should be denied. *See Lake Naci-miento Ranch Co. v. San Luis Obispo County,* 841 F.2d 872, 875 (9th Cir.1987).

materials that were ignored or omitted from the Phase I Prospectus estimates.

### b. Prospectus Statements Regarding Phase II Funding

 Plaintiffs also assert that Defendants made knowingly false statements in the Prospectus regarding Phase II budgets. Plaintiffs claim that Defendants released a relatively low $87.9 million budget (Prospectus at 5) when in fact it knew that a precise cost projection for Phase II was "non-existent." (SAC ¶ 7(a); Opp. at 69–72.) In the alternative, Plaintiffs contend that Defendants knew that a $87.9 million figure was patently incorrect since only "conceptual plans" of Phase II existed in December 1995. (Fiflis Report at 37–38.) Defendants, however, correctly assert that Plaintiffs have failed to present any evidence that raises any triable issues as to actual knowledge of falsity as to this issue.

In support of their position, Plaintiffs rely on the existence of multiple cost projections in October and November 1995 and accuse Defendants of selectively "assembl[ing] various costs and partial costs in the $87.9 [million] 'budget' included in the Prospectus, disregarding the real costs that were projected internally to complete the project." (Elliott Report at 15 and Exs. 41–43 attached thereto.) Examination of the proffered internal projections, however, reveals the fatal weakness of this argument. As Plaintiffs own expert concedes, the cited documents are not different estimates of the same project, but rather are cost estimates of different construction plans with distinctly different, separate features. (Elliott Report at 15.) Construction costs were projected to range between $67 million and $108 million, depending upon the plan chosen. As evinced by the Prospectus, Defendants opted to proceed with the plan priced at $87.9 million. (Prospectus at 6.) Thus, subsequent cost overruns cannot, alone, indicate that Defendants intentionally misstated projected costs at the time of the Prospectus' issuance. Since Phase II construction had yet to commence, the actual cost of Phase II could only be estimated. Plaintiffs fail to present any evidence indicating that Defendants revealed anything other than a good faith cost estimate of Phase II costs in their Prospectus, based upon the chosen general structural features. Dismissal of this claim is therefore appropriate.

### c. Prospectus Statements Regarding Use of the Over–Allotment

 Defendant also seek dismissal of Plaintiffs claims of falsity regarding the Prospectus' forward-looking statements about over-allotment uses. The Prospectus stated, in pertinent part: "In the event the Underwriters exercise their over-allotment option, the Company will use the net proceeds thereof ($9.5 million, in the event the over-allotment option is exercised in full) for general corporate purposes and working capital." (Prospectus at 25.) Plaintiffs contend that this statement was misleading, since the overallotment had already been "ticketed" for use in funding Phase I construction. (Opp. at 68.)

Defendants correctly argue, however, that one cannot even draw a remote inference of falsity from this statement. The funding of casino and hotel construction is inherently a "corporate purpose." Nowhere in the Prospectus is there any prohibition from using Stratosphere working capital for construction funding. Thus, this Court will dismiss Plaintiffs' claims of falsity directed at this statement as well.

### 2. Alleged Falsehoods Regarding Construction Budgets Within SEC 10–K and 10–Q Filings

 Plaintiffs contend that Stratosphere's March 15, 1996 Annual Report, filed with the SEC on Form 10–K, and the May 15, 1996 Quarterly Report, filed with the SEC on Form 10–Q, reiterated the same misleading Phase I budgetary projections made in the Prospectus. (Form 10–Q, RJN (# 134) Ex. E at 12; Form 10–K, RJN (# 134) Ex. U at 17.) Here, Plaintiffs' allegations of actual knowledge of falsity rest upon the existence and nondisclosure of various internal budgets calcu-

lated after the issuance of the Prospectus on December 19, 1995.

In order to attain dismissal of the 10–K and 10–K filing allegations, Defendants contend that, notwithstanding the existence of the proffered internal analyses, they did not possess the requisite amount of certainty to constitute "actual knowledge" under the PSLRA. To this end, Defendants point out that issuers of stock are required to be "reasonably certain" of projections, estimates and other information before releasing them to the general public. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.1981); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir.1980) ("It is just good general business practice to make . . . projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to allow them to be disclosed to the public."); *see also Flynn v. Bass Bros. Enters., Inc.*, 744 F.2d 978, 985–86 (3d Cir.1984) (noting general rule against disclosures of future earnings, appraised asset valuations and other hypothetical data of veracity). The Seventh Circuit Court of Appeals has justified this doctrine on policy grounds:

> Any firm generates a range of estimates internally or through consultants. It may reveal the projection it thinks best while withholding others, so long as the one revealed has a "reasonable basis"—a question on which other estimates may reflect without automatically depriving the published one of foundation. Because firms may withhold even completed estimates, they may withhold in-house estimates that are in the process of consideration and revision. Any other position would mean that once the annual cycle of estimation begins, a firm must cease selling stock until it has resolved internal disputes and is ready with a new projection. Yet because large firms are eternally in the process of generating and revising estimates—they may have large staffs devoted to nothing else—a demand for revelation or delay would be equivalent to a bar on the use of projections if the firm wants to raise new capital.

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir.1989), *cited with approval in In re HealthCare Compare Corp. Securities Litigation*, 75 F.3d 276, 283 (7th Cir.1996). Defendants contend that the internal budget projections compiled between January and April 1996 were nothing more than "rough estimates" that lacked the requisite certainty, due to spotty cost reporting by Taylor that culminated in a virtual information "blackout" for the last ninety days. (Lettero Decl. ¶ 15; Blumen Decl. ¶ 5; Berman Decl. ¶ 7.)

After reviewing the submitted evidence, however, this Court finds that the disputed internal budgets raise triable issues as to the extent of calculated budgetary overages and their perceived accuracy. First, before the issuance of the 10–K and 10–Q reports, Stratosphere compiled two internal budget analyses in January 1996. (1/12/96 Analysis, attached as Ex. 3, Elliot Report, Bates 1012813–14; 1/30/96 Analysis, attached as Ex. 3, Elliot Report, Bates 102820–23.) A third internal budget report was compiled on February 12, 1996. (Lettero Decl.Ex. G.) While Defendants contend that total Phase I cost estimated within the January budgets were delineated by the amounts listed in the "REVISED BUDGET" category, Plaintiffs argue that true Phase I costs also included the "enhancement" figures provided below the revised budget calculations. (*See* 1/12/96 Analysis, Bates 102813; 1/30/96 Analysis Bates 102823.) The dispute is substantial. If Phase I enhancements are considered to be pre-approved portions of the overall construction, Plaintiffs calculate that the January analyses revealed unfunded overages of $16,271,929 and $20,341,929 respectively. Given the suggestion within the June 11, 1996 Cope Memorandum that significant "project enhancements" had already been approved as of October 11, 1995, this Court finds that there is a triable issue as to whether the internal January budgets forecast substan-

tial budget overages that were not revealed in the 10–Q and 10–K reports.

Secondly, there is a triable issue as to the amount of credence Defendants placed on the January 1996 internal reports. It is true that even one of Plaintiffs' own experts opined that, "Beginning at the end of November 1995 and continuing to the end of the project, Taylor and the subcontractors were receiving so much information, new drawings and changes that there was absolutely no way they could timely respond with cost updates." (Elliott Report at 9.) This conclusion concurs with Defendants' declarations that there existed an "information blackout" from February to April of 1996. (Lettero Decl. ¶ 15; Blumen Decl. ¶ 5; Berman Decl. ¶ 7.) On the other hand, Plaintiffs point out that the internal budget analysis were deemed reliable enough by Defendants to be used to obtain monthly budgetary increases, totaling $36,876,272, as disbursements from the escrow account created by the Notes Offering. (Budget Amendments Nos. 9–12, attached as Exs. 65, 72 of Appendix (# 254) and Exs. 87,90 of Appendix (# 255)). Defendants argue that this Court should take little note of these Budgetary Amendment requests, on the grounds that they constituted only "best estimates" as required by the terms of the Disbursement and Escrow Agreement. (Notes Offering Prospectus at 77–78, attached as Ex. 19, Pls.' Appendix (# 253) (requiring delivery of certificate certifying *inter alia* "the accuracy of the Construction Budget")). Defendants further assert that their submitted internal analyses, while too rough and uncertain to satisfy the reliability requirements of federal securities law, were merely sufficient to satisfy the lower standards of the Disbursement and Escrow Agreement. (Defs.' R. at 32.) However, it is equally plausible to infer that Defendants held a strong belief as to the veracity of these figures, since they were willing to incur significantly greater project costs by seeking additional funding. This is a question that must be resolved at trial.

### 3. June 6, 1996 Press Statements

██ Defendants also seek dismissal of Plaintiffs' claim alleging that Stratosphere misstated the purpose and use of the Grand Casino Completion Guaranty. (SAC ¶ 125.) Plaintiffs complain of the following statement:

> [Stratosphere] also announced that Grand Casinos, Inc. will loan Stratosphere $48.5 million pursuant to a previously agreed upon completion guaranty. The majority of the funds advanced under the guaranty have been used to pay for enhancements to the original scope of the project.

(Lettero Decl.Ex. N.) Defendants correctly argue, however, that this statement was neither false nor misleading.

First, Defendants correctly point out that the statement was forward-looking in nature. While the press statement does contain a clause in the past tense (e.g., "have been used to pay"), it is abundantly clear that the loan had not yet occurred. That is, the first sentence indicates that Grand Casinos "will loan" funds, i.e., perform a task that has yet to be undertaken. This statement is therefore forward looking in nature. *See* 15 U.S.C.A. § 78u–5(i)(1)(A)–(B).

This Court cannot find the existence of any triable issues as to the veracity of the statement. Plaintiffs contend that while the statements suggest that "the majority" of the Guaranty funds would be used to pay for enhancements, they were in fact intended to be used mainly to cover general cost overruns. To this end, Plaintiffs proffer an internal budget estimate, dated May 21, 1996, which estimates budget deficits to be two-thirds attributable to cost "overages" and only one-third attributable to the price of "enhancements." (Appendix (# 255), Ex. 99.) This budget has not, however, been authenticated and therefore cannot contest summary judgment. *See* Fed.R.Civ.P. 56(e); *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir.1989).

Moreover, even if this document were somehow to be found admissible, its contents would not raise any triable issues. Defendants submit a declaration indicating that cost overruns were due "in large part to a long list of enhancements," such as the relocation of a power plant and the construction of an associate dining room. (Lettero Decl. ¶ 17.) This characterization of cost overruns as a function of enhancements or additional construction work is, indeed, in conformity with the opinion of Plaintiffs' own expert. *See, e.g.,* Elliot Report at 5 (describing the adverse budgetary impact of last-minute additions to construction plans). Thus, there is no indication as to the falsity of the statement's reference to the allocation of the Completion Guaranty.

In addition, the Court is not persuaded by Plaintiffs' arguments that the statement was somehow misleading because it did not indicate that Stratosphere was temporarily funding the cited budgetary deficit through the use of proceeds from the December 1995 Offering in the interim period before Completion Guaranty funds could reach Stratosphere. This temporary transfer had already been publicly disclosed in the 10–K and 10–Q filings. (See 10–Q at 22; 10–K at 3–7.) Moreover, the gist of the statement was that a budgetary shortfall existed and that Stratosphere was being forced to seek additional funding as a result. This was a truthful and complete description of the state of affairs. Accordingly, this Court finds it appropriate to grant summary judgment dismissing those claims against the June 6, 1996 Press Release.

**B. Materiality**

■ As an alternative basis to the PSLRA's safe harbor, Defendants also seek dismissal of Plaintiffs' claims on the grounds that the disputed statements or omissions were not "material." In order to establish the commission of securities fraud, "a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresen-

ted fact is otherwise insignificant." *Basic Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *see also Hanon v. Dataproducts Corp.,* 976 F.2d 497, 501 (9th Cir.1992). Materiality in turn depends upon the importance the reasonable investors would attach to the withheld or misrepresented information. *See United States v. Smith,* 155 F.3d 1051, 1064 (9th Cir.1998). If there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available," it will be held to be "material." *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978 (internal quotation and citation omitted); *see also In re Stac Electronics Sec. Litig.,* 89 F.3d 1399, 1408 (9th Cir. 1996). Failure to demonstrate materiality will constitute the "death knell" of Plaintiffs' claims, for materiality is an essential element of both the Securities Act of 1933 and the Securities Exchange Act of 1934, and is defined in the same manner under each. *See Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1446 n. 9 (5th Cir. 1993). The Court will examine the materiality of each of the alleged misstatements in turn.

**1. Materiality of Budgetary Estimates Issued in the December 1995 Prospectus and SEC 10–Q and 10–K Reports**

■ Defendants assail the heart of Plaintiffs' case by alleging that the disputed $358.9 million Phase I budgetary estimate, issued in their Prospectus and Form 10–K and Form 10–Q filings, cannot under the circumstances constitute a "material" misstatement. This attack proceeds along two fronts. As a preliminary matter, Defendants contend that the cautionary language within the December 1995 Prospectus and the other SEC filings should be added as a factor in the application of a *Basic* "total mix" test of materiality. Second, Defendants allege that contrary results from internal budget analyses conducted prior to the release of

these statements cannot, as a matter of law, represent a material omission. These arguments, however, are disabled by triable issues of fact.

■ The facts and conditions that Defendants proffer to the Court for materiality analysis are varied. First, Defendants point to cautionary language within their Prospectus and SEC filings. Defendants argue that while the inserted cautionary language alone may not be sufficient to immunize the disputed statements from liability, it may be a decisive factor under the application of a *Basic* "total mix" materiality test. (Mot. For S.J. (# 182) at 32–33.) The argument is somewhat unusual. Most courts considering the immunizing effects of cautionary statements upon forward-looking statements have done so under the single-issue focus of the "bespeaks caution doctrine,"[4] rather than engaging in a *Basic* "total mix" materiality test that considers the totality of facts and conditions. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994). Nevertheless, it is also true that the Ninth Circuit Court of Appeals has found that the doctrine "merely represents the pragmatic application of two fundamental concepts in the law of securities fraud: materiality and reliance." *Id.* at 1414. In addition, at least one court from outside this circuit has stated that the bespeaks caution doctrine "primarily represents new nomenclature rather than [a] substantive change in the law." *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir.1993). Thus, this Court finds it permissible to at least weigh the existence of cautionary statements in its materiality analysis.

In conjunction with such cautionary language, Defendants contend that any knowledge of cost overruns based upon internal budget reports generated in January and February of 1996 were so slight as to be immaterial as a matter of law. It is true that courts have found marginal misstatements of projected sales to be inactionable under the federal securities laws. *See, e.g., In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 514 (9th Cir.1991) (finding statements underestimating revenues by ten percent to be inactionable); *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1249 (N.D.Cal.1998) (determining difference between projected sales of $25 million and actual sales of $23,002,000 to be "insignificant"). Utilizing those sums in the internal budgets labeled as pre-enhancement totals (e.g., as "REVISED BUDGET" or "TOTAL BUDGET" figures), Defendants claim that their rough internal analyses revealed at best a $4 million overrun in February 12, 1996 (i.e., an overrun of less than one percent) and a $31 million overrun in May 1996 (i.e., an overrun of less than seven percent). Accordingly, Defendants contend that the budgetary projections cannot, as a matter of law, constitute material misstatements.

The weakness of this argument, however, lies in its use of disputed figures within the internal reports. As this Court stated, *supra*, there is evidence suggesting that Defendants may have known, with sufficient certainty, of Phase I overruns far greater than those listed in the pre-enhancement figures listed within Defendants' internal budgets (viz., that actual costs included pre-approved projects listed as unapproved enhancements). The precise extent of overruns and Defendants' knowledge of them at particular points in time are questions that will determine the materiality of any budgetary misstatements. The answers to these questions will also affect the power of cautionary language in the Prospectus and 10–Q and 10–K filings. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 543–44 (5th Cir.1981), *aff'd in part and rev'd in part*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (finding existence of cautionary lan-

---

4. The bespeaks caution doctrine shields forward-looking statements from suit where sufficient cautionary language is coupled with the disputed statements in such a way that no reasonable inference of fraud can be derived. *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1141 (9th Cir.1996).

guage within prospectus insufficient to avoid liability for making predictions that were known to be false at the time they were made).

### 2. Optimistic Statements of Performance in the Prospectus, SEC 10–Q and 10–K Filings and Press Releases

Defendants also seek dismissal of claims against their statements of "soft information"[5] and puffery. It is true that even optimistic statements are actionable where the defendant does not genuinely believe them, lacks reasonable grounds for his belief, or knows of undisclosed facts undermining that belief. *See Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1158 (9th Cir.1996) (citing *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1113 (9th Cir.1989)). However, when considering a statement's materiality, a district court must not "attribute to investors a childlike simplicity but rather ... determine whether a reasonable investor would have considered the omitted information significant at the time." *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 213 (4th Cir.1994) (citation and quotations omitted). Thus, vague, hyperbolic statements of puffery lack the requisite materiality to support securities fraud, since no reasonable investor would rely on such statements. *See Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir.1997); *see also San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 811 (2d Cir.1996) (characterizing statements that defendant company was "optimistic" about earnings and "expected" good sales to be mere puffery); *Searls v. Glasser,* 64 F.3d 1061, 1066 (7th Cir.1995) (finding term "recession-resistant" to be an inactionable "promotional phrase" that lacked "the requisite specificity to be considered anything but optimistic rhetoric"); *Alfus v. Pyramid Technology Corp.,* 745 F.Supp.

1511, 1519 (N.D.Cal.1990) (dismissing vague expressions of optimism about future sales).

Plaintiffs' SAC is filled with allegations that clearly implicate these sorts of soft or puffing statements. The disputed statements that fall within the Class Period are:

- Stratosphere has been designed to create an exciting and unique gaming and entertainment experience that management believes will make Stratosphere a "must see" tourist attraction. (SAC ¶ 71) (citing Prospectus at 3).

- We are exited about the opportunity to enhance the Stratosphere project ... The additional hotel rooms and related amenities will rank Stratosphere as one of the major destination resorts in Las Vegas. (SAC ¶ 89) (citing December 19, 1995 Press Release).

- "Stratosphere will be the next-generation entertainment superstore for Las Vegas and take its place among the premier attractions not only in the city, but anywhere ... Stratosphere is Grand Casinos' entry into the Las Vegas market, which is the most exciting and profitable market in the nation. I can't think of a better way to enter this market than with a landmark property. And that's just what Stratosphere will be." (SAC ¶ 97) (citing March 14, 1996 Press Release).

- Stratosphere has been to create an exciting and unique gaming and entertainment experience that management believes will make Stratosphere a "must see" tourist attraction ... Management also believes Stratosphere's unique attractions, high quality lodging and dining facilities ... will make it one of Las Vegas' most popular resort destination resorts. (SAC ¶ 100) (citing Form 10–K Report).

---

**5.** "The term soft information refers to statements of subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projec-

tions, estimates, and forecasts." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 642 (3d Cir.1989).

- There's going to be a line from the day we open for a long, long time. (SAC ¶ 110) (citing April 28, 1996 press article).

- Everything has gone very smoothly. We've had a steady stream of people going up to the tower this morning. (SAC ¶ 113) (citing May 1, 1996 public statement).

- We think over time, the Stratosphere will become the symbol of Las Vegas. We believe visitors to the city will make a visit to the Stratosphere Tower a must, just as visitors to Paris must see the Eiffel Tower. (SAC ¶ 114) (citing Berman statement).

- [T]he newest entertainment mega-resort in Las Vegas [Stratosphere], has quickly become the No. 1 paid attraction in Las Vegas based on first-week results. (SAC ¶ 118) (citing various public statements).

- These results are below the company's expectations principally due to the project not yet being completed. With the addition of 1,000 hotel rooms and suites, the opening of the retail shops and completion of other amenities ... as well as additional marketing programs, we believe visitation to the facility should increase and overall operating results should improve. (SAC ¶ 125) (citing June 6, 1996 report).

- Following the commencement of operations of Stratosphere, the Company expects to fund it operating and capital needs, as currently contemplated, from operating cash flows. (SAC ¶ 67) (citing Prospectus at 19).

Defendants correctly assert that all of the above statements are general expressions of optimism or vaguely positive statements that could not, as a matter of law, have been relied upon by the reasonable investor. Accordingly, this Court finds it proper to dismiss all claims relating to these statements as well.

## C. Actionability of the Remaining Federal Claims

### 1. Securities Analysts' Reports

■■■ Under federal securities laws, corporate defendants are subject to two types of liability for statements made by outside securities analysts. First, an issuer of stock may be held liable directly for the provision of false or misleading information to third-party analysts. *See Cooper v. Pickett,* 137 F.3d 616, 624 (9th Cir.1997); *Warshaw v. Xoma Corp.,* 74 F.3d 955, 959 (9th Cir.1996). Secondly, defendant corporations and their officers may be held liable for an analyst's projections or forecasts if they expressly or impliedly "adopt" them by placing their imprimatur on them. *See In re Syntex Corp. Sec. Litig.,* 95 F.3d 922, 934 (9th Cir.1996). Earlier, upon adjudicating Defendants' Motion to Dismiss, this Court dismissed all of Plaintiffs' claims alleging direct liability for false or misleading statements to securities analysts. *See In re Stratosphere Corp. Sec. Litig.,* 1 F.Supp.2d 1096, 1115 (D.Nev.1998). This Court also dismissed all Plaintiffs' claims of adoption, save for those allegations that (1) Defendant Lettero endorsed or approved certain reports after reviewing their contents (SAC ¶¶ 90, 92, 95) and (2) the individual Defendants distributed copies of analysts' reports and/or provided a list of analysts' coverage of Stratosphere in the packages that the company sent to potential investors (SAC ¶ 88). *See Stratosphere Corp.,* 1 F.Supp.2d at 1115–16. Defendants now seek summary adjudication dismissing these two remaining allegations.

■■■ A defendant "adopts" an analyst's forecast when he sufficiently entangles himself with those predictions so as to make them attributable to him. *See Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir.1980); *Alfus v. Pyramid Tech. Corp.,* 764 F.Supp. 598, 603 (N.D.Cal.1991). "Entanglement," in turn, exists only where there is a "two-way flow of information" in which the corporate defendant provides

misleading information to the analyst, the analyst relies on the information in preparing a securities report, and the defendant then somehow endorses or approves the report before or after its release. *See Stack v. Lobo*, 903 F.Supp. 1361, 1372 (N.D.Cal.1995). By contradistinction, a one-way flow of information where statements travel from corporate insiders to analysts, and from the analysts to the prospective buyer of stock, will not support adoptive liability. *See Syntex Corp. Sec. Litig.*, 95 F.3d at 934. Thus, the mere act of "providing analysts with historical information and correcting factual inaccuracies" is not actionable. *In re Caere Corporate Sec. Litig.*, 837 F.Supp. 1054, 1059 (N.D.Cal.1993) (citation omitted).

█ Pursuant to these standards, Defendants present sufficient evidence to meet their burden on summary judgment. As to the claim that Lettero and the other individual defendants edited draft reports sent by analysts, Defendants present a declaration asserting that they never commented upon submitted draft reports, except to correct matters of public record. (Lettero Decl. ¶ 36.) Defendants correctly point out that such conduct would, at most, constitute a one-way flow of public information insufficient to support analyst liability. The evidence put forth by Plaintiffs in opposition fails to raise any triable issues as to this matter. Some of the submitted materials improperly attempt to cast liability upon conduct that occurred prior to the certified Class Period. (*See* Pls.' Sep. Statement (# 245) ¶ 81; Lettero Exs. 40, 41.) The remainder merely confirms the fact that Lettero occasionally received draft documents (Pls.' Sep. Statement (# 245) ¶¶ 82, 84 and evidence cited therein) or initiated one-way streams of public information. (*Id.* ¶¶ 111, 114, 123, 137 and evidence cited therein). Accordingly, dismissal of this claim is warranted.

Similarly, this Court finds it appropriate to dismiss the claim of adoptive liability based upon Defendants' alleged distribution of "analysts' reports and/or [that Defendants] provided a list of analysts' 'cov-erage' of Stratosphere in the packages that the Company sent to potential investors." (SAC ¶ 88.) Defendant Lettero declares that he and his staff did not supply potential investors with copies of securities analyst reports, "except on rare occasions when a specific request was received and the requested report was available." (Lettero Decl. ¶ 36.) Plaintiffs submit no evidence to gainsay the limited scope of these distributions. (Pls.' Sep. Statement (# 245) ¶¶ 81–85, 111, 114, 122–123, 131, 137, 142.)

The identical issue was addressed by the district court in *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1377 (N.D.Cal.1995). There, the district court held that no entanglement liability could arise from the mailing of reports to two shareholders. The *Cypress* court reasoned that since there was no mass mailing and no indication of any public awareness of such mailings, the limited distributions could not support the inference of any commission of fraud on the marketplace which affected stock prices. *See id.* at 1378. This Court finds such reasoning to be persuasive and dismisses Plaintiffs' remaining claim of adoptive liability.

Plaintiffs reliance on decisions such as the administrative SEC decision in *In re Presstek, Inc.*, Admin. Proceeding File No. 3–9515, 1997 SEC LEXIS 2645 (Dec. 22, 1997), for a contrary result is misplaced. In *Presstek*, the defendants were held liable for the distribution of hundreds of reports to investors containing projections of non-public sales information upon which defendants had commented upon or, through their silence, impliedly approved. *See id.* at *35–*36. Here, Plaintiffs have failed to provide evidence indicative of any such widespread distribution of reports or policy of commenting on analyst forecasts through the use of internal, confidential data. These absences render harmless any allegations of limited distributions of analyst reports.

### 2. March 6, 1996 Statements to the Nevada Gaming Commission

In its Opposition (# 244), Plaintiffs also contend that summary judgment dismissing their suit is unwarranted, in part, due to Defendants' alleged utterance of falsehoods in testimony before the Nevada Gaming Control Board on March 6, 1996. (Pls.' Opp. at 75.) Defendants correctly note, however, that the Opposition fails to cite any portion of the SAC that supposedly raised such contentions. This Court's own review of the voluminous, 123–page SAC proved similarly fruitless.

When new issues or evidence supporting a legal theory outside the scope of the complaint is introduced in opposition to summary judgment, a district court should construe the matter as a request to amend pleadings under Federal Rule of Civil Procedure 15(b). *See Apache Survival Coalition v. United States,* 21 F.3d 895, 910 (9th Cir.1994). When amendment of the pleadings would disrupt the court's pretrial scheduling order, the standards of Rule 16 will govern the prospects for amendment late in the progression of litigation. *See Eagle v. American Telephone and Telegraph Co.,* 769 F.2d 541, 548 (9th Cir.1985), *cert. denied,* 475 U.S. 1084, 106 S.Ct. 1465, 89 L.Ed.2d 721 (1986). This Court's Joint Discovery and Scheduling Order (# 175), modified by Clarification Order (# 204), specifically stated that the deadline for the amendment of pleadings would be extended only until August 27, 1998. (Order (# 204) at 2.) Plaintiffs submitted their impromptu request for amendment on the date of the filing of their Opposition (# 244) on April 2, 1999. Rule 16(e) provides that a final pretrial order "shall control the subsequent course of the action" and "shall be modified only to prevent manifest injustice."

Here, the Court finds that barring Plaintiffs from alleging the utterance of misstatements in front of the Gaming Commission would not constitute a "manifest injustice." Under Rule 9(b), "the circumstances constituting fraud or mistake shall be stated [by plaintiffs] with particularity."

Courts must apply this general standard to claims of securities fraud. *See, e.g., Berry v. Valence Tech., Inc.,* 175 F.3d 699, 706 (9th Cir.1999). "While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir.1989). To allow Plaintiffs to amend their SAC at this late stage of the proceedings would render the particularity requirement for pleading securities fraud a nullity.

### 3. Temporary Diversion of Phase II Proceeds

In a similar vein, Plaintiffs also allege for the first time in their Opposition that even the temporary use of proceeds from the December 1995 Offering constituted a "secret illegal diversion." (Opp. at 2.) This act, Plaintiffs contend, constitutes a basis of liability under the securities laws independent from the Defendants' issuance of "numerous false and misleading statements (and omissions) of material facts to investors and the securities market." (Id.) Plaintiffs urge this Court to permit this eleventh hour amendment, since they were allegedly only able to discern evidence of such diversions upon the production of a "proverbial smoking gun" document produced upon order of the magistrate judge on September 14, 1998. (Opp. at 3 & n. 3.) The production of new evidence, of course, in certain circumstances might justify the late modification of litigation. However, Plaintiffs' pleadings within the SAC itself disable this argument.

Review of the SAC reveals that Plaintiffs possessed evidence that supported the commission of such purportedly illegal diversions long before the expiration of the ordered amendment period. Specifically, Plaintiffs asserted in their SAC that:

> Based upon Stratosphere's disclosures in publicly filed financial documents following the end of the Class Period, it is clear that during the first two quarters of 1996, defendants caused approximate-

ly $26 million of the Stock Offering proceeds to be used to complete Phase I construction, in contravention of express representations contained in the Registration Statement and Prospectus. (SAC ¶ 65.) However, even a broad reading of the SAC reveals that this allegation was made in order to support the contention that Defendants possessed knowledge of the falsity of budgetary statements made in their Prospectus, SEC filings and other public statements. (SAC ¶¶ 62–66.) There is a complete absence, however, of any hint that these alleged diversions could constitute *per se* a separate source of liability. Accordingly, this Court finds it appropriate to bar the assertion of this new claim as well. *See United States v. First Nat'l Bank of Circle*, 652 F.2d 882, 886 (9th Cir.1981) (mandating conformity with pretrial order restrictions in order to prevent "trial be ambush" and encourage timely preparation by parties for trial).

### D. State Claims

 This Court also finds summary adjudication dismissing Plaintiffs' state law claims to be inappropriate at this time as well. Plaintiffs, in conjunction with their federal claims, have asserted state securities fraud claims under Nev.Rev.Stat. §§ 90.570 and 90.660 (1997). However, the same triable issues that prevent summary adjudication of Plaintiffs' claims under federal law also bar immediate disposition of their state claims. *See Shivers v. Amerco*, 670 F.2d 826, 831 (1982) (interpreting Nevada's "blue sky laws" in a manner consistent with federal Rule 10b–5). Since liability under the federal law is still an open question, this Court will also deny Defendants request to dismiss Plaintiffs claim under Nev.Rev.Stat. § 207.350 (1997) (Nevada state equivalent of federal RICO) since it is still a triable issue whether Defendants may have committed a sufficient number of predicate offenses. *See* Nev.Rev.Stat. § 207.390 (1997) (" 'Racketeering activity' means engaging in at least two crimes related to racketeering . . .").

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants Grand Casinos', Lyle A Berman's, Stanley M. Taube's, David R. Wirshing's, Thomas A. Lettero's, Andrew S. Blumen's, and Thomas G. Bell's Motion for Summary Judgment or, in the Alternative, Summary Adjudication (# 182), as joined by Defendants Robert E. Stupak and Bob Stupak Enterprises is GRANTED in part and DENIED in part. This Court DISMISSES all allegations asserted in reference to: (1) Phase II funding levels; (2) "over-allotments uses," as stated in the December 19, 1995 Prospectus; (3) the purpose and use of the Grand Casino Completion Guaranty, as stated in the June 6, 1996 Press Statement; (4) the vague expressions of general optimism (issued within the December 19, 1995 Prospectus, the 10–Q and 10–K Filings, press releases and other public statements) referred to in this Order; (5) the adoption of statements in securities analysts reports; (6) the alleged utterance of misleading statements before the Nevada Gaming Commission; and (7) the temporary diversion of Phase II proceeds to fund Phase I. Defendants' Motion for Summary Judgment or, in the Alternative, Summary Adjudication (# 182), is DENIED in all other respects.

IT IS FURTHER ORDERED THAT Defendants Grand Casinos', Lyle A Berman's, Stanley M. Taube's, David R. Wirshing's, Thomas A. Lettero's, Andrew S. Blumen's, and Thomas G. Bell's Motion to Strike Expert Reports (# 259) and Motion to Strike Plaintiffs' Separate Statement of Disputed Material Facts (# 263A) are GRANTED insofar as the statement, made by Professor Ted J. Fiflis in the Fiflis Report (# 247) at 23, beginning with the words "These representations in the Stock Offering Prospectus" and ending with the words "under the statutes" is STRICKEN. These motions are DENIED in all other respects.